Irwin W. STRATMORE, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Murray STRATMORE, Plaintiff,

v.

UNITED STATES of America,
Defendant and Third-Party
Plaintiff,

v.

Irwin W. STRATMORE, Third-Party
Defendant.

Civ. A. Nos. 851–59, 852–59.

United States District Court
D. New Jersey.

June 21, 1962.

Milton & Keane, by John Milton, Jr., and Allan H. Klinger, Jersey City, N. J., for plaintiffs.

David M. Satz, Jr., U. S. Atty., by Sidney E. Zion, Asst. U. S. Atty., for the Government.

WORTENDYKE, District Judge.

The two captioned cases involve common questions of law and fact and were therefore consolidated for trial. Jurisdiction of the action by each plaintiff against the United States of America is based upon 28 U.S.C. §§ 1346(b) and 1402(b). The two main actions, therefore, were tried to the Court without a jury. Trial of the third-party action, in docket number 852–59, was severed. It involves a claim of the United States of America against Irwin W. Stratmore for contribution, contingent upon the establishment of liability in favor of the plaintiff Murray Stratmore in that action. Only the issue of liability was tried in each case.

This litigation arises out of the crash, on October 4, 1958, while attempting to land at Teterboro Airport in this District, of a privately owned, twin-engine, Piper Apache Model PA23 airplane, manufactured in 1955. The aircraft was operated by Irwin W. Stratmore, who was seriously injured, as was his invited passenger and brother, Murray Stratmore.

The day of the crash was a Saturday, the weather at the time was clear, the temperature approximately 65° F., and the wind approximately 5 miles per hour, from the south. Weather conditions were such as to render Visual Flight Rules (14 C.F.R. 60.30–33) appropriate.

Earlier that day the plaintiff, Irwin, testified that he had invited his brother, Murray, to accompany him upon a flight to Reading, Pennsylvania, for the purpose of consulting with someone there respecting the possible purchase of an article of equipment by Irwin for the company of which both he and his brother were officers and directors. Although at first demurring, Murray finally consented to accompany Irwin, and they took off from Teterboro Airport at approximately 12:30 p. m., Eastern Daylight Saving time. While flying in the direction of Reading, Pennsylvania, from Teterboro, New Jersey, Irwin made various tests of his radio communications systems, and, in the course thereof, and when he was in the vicinity of North Philadelphia, he learned from a news broadcast that a World Series baseball game was in progress. He says he decided to refrain from landing at Reading, and reversed his course to return to Teterboro, and explained that he felt that the person whom he planned to see in Reading would probably be in attendance at the baseball game, and therefore would not be available for the purpose of the proposed conference. When approximately two miles to the west of New Brunswick, New Jersey, on the return flight toward Teterboro, the left, or port, engine of the aircraft "became rough." The pilot inferred from this malfunctioning of the engine that ice had formed in the carburetor fuel jet. He therefore pulled out the knob activating the carburetor heater for that engine. This caused the engine to stop. He proceeded to "feather" the left propeller, but did not attempt to restart the engine. Instead of attempting to land at either of the nearer airports, in the respective vicinities of New Brunswick and Linden, or at that located at Newark, New Jersey, he decided to proceed to his home airport at Teterboro. His speed in that direction was 110 miles per hour, with his right (and only operating) engine turning over at 2,400 rpms, at 75% of its power, under 24 inches of manifold pressure. He was flying at an altitude of 2,500 feet. He says that when he had reached a point approximately three miles south of Newark Airport, he radioed the Teterboro tower, explained the condition of his aircraft, asked for landing instructions, was cleared for runway 1 or runway 6, and advised that the winds were then calm. He elected to use runway 6,[1] so advised the tower, and was cleared for that runway. He informed the tower that he had one passenger aboard and that his left engine was "out". He testified that he called the tower again when his plane was over the outer marker of Teterboro Airport (4.6 statute miles from the beginning of runway 6), and was advised that the airport had been cleared of all traffic and that emergency equipment was standing by. At that time he was at an altitude of 2,500 feet. The pilot says that the tower called him again when his plane was between the outer and the middle marker, and informed him that his landing gear was not down. To this the pilot says he replied that he was aware of the position of his gear because he was then in the course of pumping it down.[2] He

1. Runway 6 is 100 feet wide and extends in a general northeasterly direction from its threshold nearest to the approach lights, for a distance of 5,000 feet. The control tower is situated approximately at the mid-line of this runway.

2. The Owner's Operating Manual, admitted in evidence, discloses:

The right engine is equipped with a vacuum pump and the left engine with a generator and a hydraulic pump for actuating the landing gear and flaps. Lowering and retracting of the landing gear is accomplished through hydraulic cylinders at each leg, actuated by hydraulic fluid pressure from the left engine-driven pump. Gear retraction by the left engine pump takes approximately 11 seconds; lowering of the gear about 12 seconds. In the event of hydraulic pump failure, hydraulic pressure for gear or flap operation can be obtained by manipulating the manual hydraulic pump located with the gear and flap controls in the control quadrant, situated immediately below the center of the instrument panel in the cockpit. For emergency extension of the

fixes his position at 0.575 statute miles from the runway when this conversation took place. When over the runway threshold lights he was aware that his gear was down and locked (according to the cockpit indicators);[3] he had also put his flaps down, lowered the nose of the aircraft and partially closed his throttle. His stated altitude was then between 125 and 150 feet. He testified that he had trimmed his elevators to compensate for the retardation of his throttle, and rudder tab had been re-trimmed. His propeller was set at full pitch; his speed at 90 miles per hour. The green gear lights on the control

pedestal were lighted, the amber light was out. The manual gear pump handle was in a neutral position, and no light flashed at the end of that handle (as it would had the gear been less than completely extended). He was wholly committed to land at that time.[4] He insists however, that, when he was at that point, and under those conditions in his descent, the tower again advised him that his flaps were down but his gear was not. He says that he told the tower it was mistaken, but that the tower reiterated its statement of the gear position, and told him to "go around." He says that he then advanced his throttle to full pow-

landing gear, if failure of the hydraulic system should occur due to line breakage or selector valve malfunctioning, a separate $CO_2$ extension arrangement is provided. Pulling the ring-pin in the $CO_2$ control under the pilot's seat causes the $CO_2$ to flow to the gear-actuating cylinders through separate lines and shuttle valves, forcing the gear down. A rudder trim tab is operated by manually turning a crank in the center of the forward cockpit ceiling, adjacent to a larger crank, by means of which the longitudinal trim is adjusted. Ailerons and rudder are connected by cables with the control wheel and rudder pedals. To raise or lower the landing gear by means of the emergency hydraulic pump, in case of the failure of the left engine, requires a total of 30 to 40 minimally resistant pump strokes, requiring 20 to 30 seconds to accomplish.

3. The same Owner's Operating Manual further discloses:

The position of the landing gear is indicated by four light bulbs located directly below the engine throttle handles on the control pedestal. When three green lights, arranged in a horizontal row, are on, all three legs of the landing gear are down and locked. When an amber light just above the three green lights is on, the landing gear is entirely up. When no light shows, the gear is in an intermediate position. When either one of the engine-throttle handles is pulled back, a red light in the landing gear control knob flashes if the gear is up. When both throttles are closed beyond a given power setting, with landing gear wheels not down, a warning horn sounds in the cockpit. (There is a mechanical latch positioned just above the landing gear control lever which serves to prevent inadvertent re-

traction of the landing gear on the ground.)

4. The Owner's Handbook for the operation and maintenance of the Piper Apache Model PA23, also admitted in evidence, in discussing engine failure during cruising flight, advises that, as the engine loses power, a slight yaw in the direction of the dead engine will occur, which can be corrected readily with the rudder or the rudder trim tab. The instructions suggest that while the plane is slowing down to the single engine cruising speed of about 100 miles per hour, at low altitudes and moderate power settings, the propeller on the dead engine should be feathered by pulling the throttle to idling position, and the propeller pitch control fully back. Feathering of a propeller can be accomplished only while the failing engine is rotating—not if the engine stops completely.

Best single engine performance is obtainable with the dead engine wing held up about three degrees higher than level to help counteract the tendency of the aircraft to turn in that direction.

In order to lower the landing gear or flaps with the left engine dead, the hydraulic hand pump located in the control pedestal must be used.

In approaching a landing with one engine out, the power on the good engine should be reduced and the aircraft gradually retrimmed by means of the rudder tab. When it becomes obvious that the airport can be reached easily, the landing gear should be lowered, and the indicators checked to make sure that the gear is down, and locked. It is recommended that a little extra altitude and speed be maintained during the approach, and that the flaps be lowered at the last moment before landing.

er, spun his rudder trim tab to compensate for the increased thrust of his single right engine, and elevated the nose of the aircraft in an effort to "climb out." At that point he had progressed over the center line of the assigned runway for some 2,500 of its 5,000 feet. That runway is intersected by a taxi-way extending in a southeasterly direction from the control tower. It was at or slightly to the northeast of that intersection with the taxi-way, on runway 6, that the aircraft left the course of its landing descent over the center line of the runway, and entered into the left turn, in the course of which it crashed. The point at which the aircraft left its proper course over the runway and performed the sudden turn to the left took place directly in front of the control tower and within the unobstructed view of the tower personnel. Although he was then too near the ground to permit a turn, he nevertheless attempted to follow through with such a maneuver to the left when the plane started to pull in that direction of its own volition. He brought up the nose of the aircraft, which caused it to stall and drop off toward the heavy left wing, striking the ground and spinning into an angle of 90°.

The pilot testified: "The first thing I did was apply full power (to the single operating right engine). The next thing I did was spin the trim tab. I hit the two handles and then I started to pump like mad, and, of course, this is what happened, you see, I tried to keep the airplane flat first to get a little air speed, and then I commenced to put my nose up to get some climb on it. That is when it started to drift to the left of the runway * * * it had gotten to a point where it had turned into—the good engine on my right had overridden the rudder to such a degree that *I knew there was no chance of climbing out.* The drag was my nemesis. * * * I had one of two choices, retract my power and land straight forward, or try to make a turn into that dead engine since the angle was already established, and that is what I did. * * * Since the airplane had

started to make * * * a left turn on its own I figured my angle was already established, and I only had a choice of landing straight forward or to the left, because if I had to go to the right I would have to go down more than 180 degrees, you see * * * so what I actually did was I left full power on and put my yoke, that is my wheel full forward, and held the turn rudder and elevator * * * I put that nose down as far as it would go and that is what I am implying here. I can remember touching it up against the stop. I've always been taught that the one thing you want to do is to keep this nose down. * * * However, I wasn't able to complete the full 180 degrees before the ground came up, or I approached the ground. I would say it was in the neighborhood of an angle about * * * possibly 165 or 170 degrees rather than 180. As the ground came up I pulled back on my yoke. I pulled back on my throttle at the same time, and due to the excessive speed that was necessary to make this turn, you see, the airplane ballooned. * * *" The pilot explained that he had to pull up the nose of the aircraft faster than required for a normal landing, and this caused the aircraft to "balloon" and stall "at a higher point than at a lower point and it dropped flat on its belly, heavy on the left side, and spun about 90 degrees * * *."

On pretrial deposition, Irwin Stratmore (the pilot) testified that he had never attempted to go around on one engine, with landing gear and flaps down, but that he had frequently practiced go-arounds from simulated landings, with gear and flaps up. When, as he claims, the pilot received the directive from the tower to go-around, the aircraft had traversed only half of the length of the runway. At that point, the pilot testified (in this pretrial deposition) that he applied full throttle, retrimmed his rudder, brought his flaps and gear handle into the up position, and commenced pumping. He was then at an altitude of about 100 feet, traveling at a speed of 90 miles an hour. The added speed, coupled

with the elevation of the aircraft's nose for the desired rate of climb, caused the aircraft to "balloon" momentarily, and to turn to the left toward the dead engine. The pilot helped this left turn by using his rudder and ailerons. In other words, he voluntarily banked and turned left, electing to take his chances on the calm wind, in the face of his recognized option to retard the good engine and land straight forward. He still had about 2,500 feet of runway in which to land straight ahead, and his speed of 90 miles per hour (132 feet per second) was the proper gliding speed for landing purposes, according to the instructions contained in the Manual. At gross weight, with full flaps and no wind on the hard runway which the airport provided, his minimum landing roll would have been 670 feet under standard conditions.

It is the contention of the pilot that, although all of the mechanical and advisory devices with which the plane was equipped indicated that his landing gear was fully extended and locked when he was at a point over the runway from which he could have descended to a safe landing thereon, the radio advices from the tower caused him to doubt the reliability of the plane's equipment (which had never before misled him), and induced him to attempt to "climb out" of the landing pattern to which he had committed himself.

██ Control of flight operations at the airport was being exercised by personnel in the control tower who were concededly employees of the United States, acting within the scope of their employment. Each of the plaintiffs charges that the tower personnel were negligent in their observation of the approach of, and in the directions which were given to the pilot of the aircraft in his attempt to land with one of the two engines inoperative. The burden rests upon the plaintiffs of proving, by a preponderance of the evidence, that such alleged negligence was the proximate cause of the crash. Upon sustaining such a burden, the liability of the United States would exist in the same manner and to the same extent as that of a private citizen under like circumstances.

It has been held that if a Government control towerman is guilty of some negligent act or omission in doing his work, the Government is liable for resulting injury in the same manner and for the same reason that it is liable for injury done by the driver of a mail truck who, in the exercise of his discretion as to how to drive, negligently runs through a red traffic light. Eastern Airlines v. Union Trust Company, 1955, 95 U.S.App. D.C. 189, 221 F.2d 62. In the cited case the negligence charged and proven against the tower personnel consisted in failure to issue timely warning to one of the planes that the other was also on final approach, *after the tower had cleared both planes for the same runway at approximately the same time.*

Applying this principle it appears that two critical factual issues are presented: (1) did the tower induce the pilot to believe that his gear was *not* down, and direct the pilot to "go around" when it should have been obvious to the tower personnel that it would be hazardous, if not impossible, for the pilot to attempt to obey such a directive; and (2) if so, were the acts or omissions of the tower personnel proximately causal of the crash of the aircraft?

A witness, Del Campo, in a standing plane, awaiting permission to take off, first observed the Stratmore aircraft about three-quarters of a mile away from the airport, at an altitude of about 500 to 600 feet, at which point he further observed that its landing gear was being lowered. [His vantage point was on a "waiting" runway, close to the threshold of runway 6, some 2,500 or more feet closer to the approaching craft than was the tower.] This witness, whose radio was tuned to the tower frequency, corroborates Irwin Stratmore's version of the tower's first two admonitions to the Apache. He heard the tower advise the aircraft, when it was about a half-mile out, that its wheels had not been lowered, and that when it was over the runway threshold, he heard the tower warn the

aircraft that its flaps were down but that its landing gear was not. At this point the descending airplane was observed by the witness to be at an altitude of between 100 and 150 feet, with its landing gear fully extended and its flaps at 15 degrees. It descended 25 feet more, and traveled over and along the center line of runway 6, maintaining constant altitude. This witness adds: "Then there was a transmission from the tower stating he may use any runway at his discretion, or the grass. Then I don't recall how it was injected (sic), but he was told to go around. This might have been all part of one conversation back and forth. This is why it is so hard. I have only heard one side of this conversation.

* * * [A]bout halfway, or not quite halfway, three-quarters of the way down the runway the pilot of the airplane executed a left-hand turn * * * and the airplane climbed briefly. He executed his first left turn, he was all right. It was more like 180. It sort of went into a climbing turn, it appeared to stall out and drop flat, and more or less at an angle. Then it leveled off a little bit above the ground and hit flat on the ground." It was the expressed opinion of this witness that Stratmore "could have executed a landing on that runway any time he chose to do so up until the time he made the turn. He still had a half a runway, which I would say would be well over 2,500 feet."

A passenger in Del Campo's standing plane, Reingold, testified that he observed the Stratmore Apache when it was approximately 400 feet south of the threshold of runway 6, and heard the tower advise the pilot that his gear was not down. As the aircraft passed the location of this standing plane, which was on the westerly taxi-way south of the tower, the front wheels of the landing gear had been lowered. This witness also said that he heard a second transmission from the tower to the approaching plane, advising that the gear was not down. He did not hear any communication from the aircraft itself, but as it continued past the center taxiway, the

witness says that the tower advised the pilot to "use any runway * * * discretion," and, following the latter transmission, the witness testified "the plane surged ahead and raised up on its left wing, the right wing went up and made a 180 and crash landed."

Another witness for the plaintiffs, Lytle, who was waiting on foot, to take photographs from the ground of flights using the active runway, and who is a commercial pilot and flight instructor with a twin-engine rating and over 6,-000 hours of flight time, testified that the aircraft appeared to make an ideal approach, but was late in getting its flaps and gear down. As the plane crossed the runway threshold, he noted that its "landing gear and flaps were either down or coming down." He photographed the aircraft as it flew past his position, as well as after it had crashed, and these prints are in evidence. However, they are unclear with respect to the position of the gear and flaps as it flew by at 100 to 150 feet elevation. (See footnote 5, infra.) He heard power applied to the right engine; the plane continued in level flight, and then started a "fairly steep climb-out, * * * straight ahead towards Route 46" but before it "reached the limits of the airport * * a turn was started to the left while in the climb, * * * but since the rate of bank increased and reached and exceeded 30 degrees bank, I said to myself, 'He has lost it'." This witness estimated the plane's speed over the airport at 110 miles per hour and expressed the opinion that Stratmore would have been able to set down the aircraft on the remaining length of runway 6 if he had trimmed his rudder.

Another witness, who was emerging from the Atlantic Aviation Corporation building, which adjoins the control tower, observed the Apache above a point 800 feet from the beginning of runway 6, at an altitude of 150 feet, in an apparently normal approach, with left propeller feathered, and gear and flaps down. When the plane reached a point (still 150 feet above) at the "center intersection"

it commenced to make a left turn, lost 50 feet of altitude, applied more power, tried to pull out, stalled in a left bank, slipped down to the left, hit the ground and spun around into an easterly direction. A brother of this witness, also an employee of Atlantic Aviation, generally corroborated him.

An airport operations agent, Felice, manning a radio-equipped emergency water truck, testified that he first observed the aircraft over the threshold of the runway, with its landing gear still up. This witness radioed to the tower from his truck, advising of the position of the landing gear. He then observed the gear commencing to descend, noting that the aircraft at that time was at an altitude of from 250 to 300 feet, and so informed the tower. At 125 to 150 feet elevation, the plane appeared to this witness to climb out of its landing descent, with its landing gear more than halfway extended, banked left, headed towards the tower, and spun around into a crash.

June Keddy, a witness from the air, testified for the defendant. She was the holder of a student pilot's license, and was practicing touch-and-go landings at the airport when she heard the tower clear the area of traffic by reason of the approach of an aircraft coming in for an emergency landing. She was circling the field, and her radio was tuned to the tower frequency. She heard the tower advise the pilot of the approaching plane that its landing gear was not down; but after the aircraft had come over the runway, she heard the tower advise that its gear *was* down.

The approach of the Stratmore aircraft, and the events which took place from the time it passed over the threshold of runway 6, was in the constant view of each of the control tower personnel. Biggio, in the tower, received the pilot's initial transmission when the aircraft was three miles south of the Newark airport, at an altitude of 2,500 feet, with one engine out, requesting landing instructions. This towerman then cleared the pilot for straight approach to runway 1, but upon the pilot's request, allocated runway 6 for the purpose. This witness first observed the aircraft over the outer marker of the airport, when the pilot reported an altitude of 2,000 feet. He then directed the pilot to continue his approach but at that time said nothing respecting the aircraft's landing gear, and this transmission from the tower was acknowledged by the pilot without comment. When the aircraft was still three miles out, this towerman observed it through the binoculars, and advised the pilot that his *landing gear was then apparently retracted*.[5] This communication was also acknowledged by the pilot without further comment. As the aircraft passed over the middle marker, at an altitude estimated by the towerman at 800 feet, the pilot was again advised that his landing gear was in an up position. This communication also was merely acknowledged by the pilot. When over the threshold of runway 6, the tower advised the pilot that the landing gear *still appeared to be up,* but immediately supplemented this advice with the statement that it appeared to be descending. To this last communication no response was received from the pilot. When the aircraft had traversed approximately one-half of the length of the runway, and at a point directly in front of the tower, it was observed to commence a left banking turn, and the tower advised the pilot that *if* he was taking the aircraft around, he was cleared to land on any runway. This control tower witness

5. The landing gear of the plane was of the tricycle type. Even when fully retracted, the two main wheels partly protrude beneath the lower surface of the fuselage. The Owner's Operating Manual states that "all three wheels protrude about one-third of their diameter when retracted." In such a position, they could create the impression in the mind of a distant observer that they were partially extended. In the case of a Piper Apache, one on the ground might be able to tell visually whether the landing gear was completely retracted, but could not determine with certainty whether or when it was fully down, or locked in position.

denied that he had ever instructed or directed the pilot to take the aircraft around. He also denied that the pilot had advised him that he was pumping down his landing gear, and that he made any further transmission to the aircraft after advising the pilot that the landing gear was coming down, until after the plane commenced to make the left turn. Another member of the control tower personnel, Hicha, on duty with Biggio, denied hearing any communication respecting the landing gear of the aircraft. This witness (Hicha) testified that as the aircraft crossed the intersection of the east-west taxi-way with the runway, at an altitude above the top of the tower, and when the aircraft was in the vicinity of the wind "T", the plane appeared to veer to the left, and went into a left turn, ending in a crash. This witness observed that the aircraft's landing gear had been extended when it was over the threshold of the runway.

Murray Stratmore, the passenger in the aircraft, was unable to shed any light upon the cause of the crash because he could remember nothing which had occurred following take-off, an hour and a half earlier.

It is the theory of both of the plaintiffs in this case that the emergency which developed when the aircraft commenced to turn to the left was *created* by the negligence of the tower personnel in its advices to or its failure to advise the pilot respecting the position of the landing gear. This theory was supported upon the trial by the testimony of a flight instructor and commercial jet pilot, Binder, with over 15,000 hours of flying time, who expressed the opinion, in response to an hypothetical question, that the crash was caused by the pilot's acting upon misinformation in attempting to go-around in a configuration of which the aircraft was incapable at the time. It was his further opinion that having previously informed the pilot that his wheels were up, the tower should have subsequently informed him when they had come down. Another expert witness, an airline pilot of impressive qualifications,

in response to a similar hypothetical question, expressed the opinion that if the aircraft's landing gear had been up when the pilot was ordered to go around, he could have accomplished the operation without difficulty; but that the failure of the tower to advise the pilot when his gear had come down, made it impossible for him to comply with the tower's directions.

The preponderance of the evidence in the present case discloses that the control tower personnel were aware of their respective responsibilities in noting (which the pilot concedes) that as the plane approached the assigned runway, its landing gear was not fully extended; indeed, the pilot testified that he was then still vigorously "pumping down" his gear, as he passed over the runway threshold. It is equally clear from the evidence that the pilot ultimately succeeded in fully lowering his gear and flaps before the aircraft commenced to drift to the left from its previous course over the center of the runway. The aircraft at all times after it passed the threshold, was directly in view of the tower personnel. I cannot accept the testimony adduced in behalf of the plaintiffs that despite their opportunity to observe to the contrary, the tower personnel informed the pilot that his gear was not down after it had been completely lowered. Neither do I accept the pilot's insistence that when he was in the midst of his emergency, the tower directed him to go around.

■ An airplane pilot is in exclusive control of his aircraft in an emergency. United States v. Miller et al. (United States v. Terminal Flour Mills Co.), 303 F.2d 703 (both of which were consolidated for argument, and decided on May 14, 1962, 9th Circuit). He alone is the one who knows the conditions which confront him, both within and without the cockpit, what he intends to do, and what he can accomplish. C.F.R. § 60.1 provides: "The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to the operation of the aircraft in

emergency situations which require immediate decision and action. The pilot may deviate from the rules prescribed in this part to the extent required by considerations of safety."

In United States v. Schultetus, 5 Cir., 1960, 277 F.2d 322, the Court of Appeals reversed the District Court in finding liability on the part of the United States for alleged negligence on the part of the control tower operators. At p. 327 of the opinion, the Court pointed out that "The theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law, have assigned this responsibility to the operators of aircraft." And, at p. 326, the Court of Appeals quoted from the Civil Air Regulations of the Civil Aeronautics Board, as follows: " 'The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft' ", citing 14 C.F.R. § 60.2.

As was pointed out in Johnson v. United States, D.C.Mich.1960, 183 F. Supp. 489, at p. 492, affd. 6 Cir. 1961, 295 F.2d 509, "Section 617.4 of 14 Code of Federal Regulations defines the objective of the Air Traffic Control Service as follows: 'The primary objective of the air traffic control service shall be to promote the safe, orderly, and expeditious movement of air traffic. This shall include: (a) Preventing collisions between aircraft and between aircraft and obstructions on the movement area. (b) Expediting and maintaining an orderly flow of air traffic. (c) Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight. * * *' "

Control tower personnel are not in a position to determine what mechanical and physical indications are given to the pilot within the cockpit, respecting the position of his landing gear, flaps and other aspects of the aircraft and its equipment. Only the pilot of the aircraft involved in this case was in a position to observe that his green gear-lights were illuminated, the amber light was extinguished, the flashing red light at the end of the hand-pump handle was not lit, and the handle itself was in a neutral position. All of these factors indicated that the gear was in fully extended position and locked therein. The position of the flaps was directly observable by the pilot through the cockpit window. Only the pilot could tell whether the horn (which would warn of incomplete lowering of the gear) was sounding. All of the conditions manifest to Stratmore when he had descended to 150 feet altitude over the threshold of the runway, irrevocably committed him to complete the landing which he was in the process of making. Even if the communications from the tower created a doubt in his mind respecting the position of his landing gear, elementary instruction in the principles of flight must have made it obvious to him that he *could not* safely go around after having descended below an altitude of 400 feet, with only one engine functioning. The Owner's Operating Manual for the aircraft states that the Apache is designed to make *gear-up* emergency landings without extensive damage to the structure of the airplane. It states that all three wheels protrude about one-third of their diameter when retracted, and the structure is provided to take minor loads in this condition. The evidence was uncontradicted that the minimum control speed of the Apache with one engine dead was 85 miles per hour. It was, therefore, essential that no lower speed should be permitted while the aircraft was traveling over the center line of the runway on its descent. Before attempting to climb out of a landing attitude at a low altitude, it was necessary to increase the speed of the aircraft to at least 95 miles an hour.

The Government called as an expert, Richard Clause, a Federal Aviation Agency flight inspector, who was experienced in flying and testing multi-engine aircraft, including those of the type involved in the crash with which we are

here concerned. He testified that, under the circumstances embodied in the hypothetical questions which incorporated the testimony of the pilot Stratmore, he would have pumped down his landing gear at the outer marker, and that he would still proceed to land, despite any directive from the tower that he go around. It was the opinion of this witness that when the aircraft, by reason of its flight characteristics, had descended to an altitude of 400 feet or less, its pilot would have been committed to land, and should not, under any circumstances, attempt to go around. It was further his opinion that the causes of the crash of which the plaintiffs complain, were as follows: failure of the pilot to heed and rely upon the cockpit indications of the position of his landing gear; failure to maintain directional control of the aircraft; failure to reduce the engine speed; and failure to lower the nose of the aircraft. This witness had confirmed his opinion by experiments with a similar type of aircraft, with left engine at zero thrust, a few days prior to the trial.

I am forced to the conclusion that the deviation of this aircraft from its course over the center line of the runway resulted from the loss of minimum control speed and the development of a stall through dropping of the left wing, and the consequent increase of its angle of attack.[6] The Owner's Operating Manual warns that the best single engine performance of an Apache will be obtained with the dead engine wing held up about three degrees higher than level, to help counteract the tendency of the aircraft to turn in that direction.

The evidence discloses that the aircraft traveled over the center line of the runway, after crossing its threshold, in level flight for an observable distance, at an apparently uniform altitude before it swung or turned off to the left, and before the retarded right engine throttle was moved forward in the pilot's attempt to climb out. It is my opinion that failure of the aircraft to maintain its control speed over the runway, combined with the increased drag of the left wing due to the dead left engine, caused by the pilot's efforts to "climb out", initiated its uncontrollable yaw or spin in the direction of the left wing, which rendered ineffective, by reason of the low altitude at which the plane was then flying, all efforts of the pilot to make a safe landing turn in that direction.[7]

6. The lift of an airplane wing (airfoil) is obtained either by the curvature (camber) of the wing section or by setting the wing at an angle to the direction of its motion through the air, or both. The direction of the air relative to the plane is called the direction of relative wind. The angle between the chord of an airfoil section and the direction of relative wind is called the angle of attack of the airfoil. The total lift of an airfoil is the sum of the induced lift resulting from the camber of its cross-section and the dynamic lift created by the impact of the air on the under surface of the airfoil when presented to the wind at a positive angle of attack. If the angle of attack becomes negative (below 0°) there is no lift in the wing. If a plane decreases its speed, the wings must have a higher angle of attack in order to get the same lift. If the plane continues to decrease its speed and increase the angle of attack of the wings, the angle is reached at which burbling begins, which sets up self-generating loss of lift, which terminates in a stall. It is important to realize that a plane will stall when gliding just as readily as when flying, if not more easily, unless the necessary speed is kept up. You must be very careful, therefore, to keep the nose of the plane pointed down. If you get to flying level, the plane may lose gliding speed and stall before you realize what has happened. If a pilot tries to make a sharp turn at too high an angle of attack, the loss of lift due to burbling is such as to render the lift insufficient for its requirements and the centrifugal force causes the plane to stall, even at high speed. Pope & Otis: Elements of Aeronautics.

7. Id. In discussing a spinning stall, at p. 132 of the cited work, the authors say:

"It is thought that when a plane stalls, one wing sometimes stalls slightly sooner than the other, then that wing drops, tipping the plane to one side. Let us say it is the left wing which stalls first and drops. As the left wing drops, its angle of attack is increased and it stalls still

Had the pilot continued on the same course, he would have had ample room to complete the landing of the aircraft on runway 6.

Having charged the tower personnel with negligence in improperly or inadequately advising the pilot as the latter approached the airport for landing, the plaintiffs must satisfy the trier of the issues of fact, by a preponderance of the evidence, that (1) a specific government agent advised and directed the pilot; (2) the advice and direction was incorrect, inadequate and improper to the knowledge of the advisor; and (3) such advice and direction was a proximate cause of the crash of the airplane.

The evidence satisfies me, and I find, as follows:

1. The communications between the tower and the aircraft were made and received by Biggio, one of the tower personnel.

2. Biggio had reasonable cause to believe, until the plane reached the threshold of runway 6 that the plane's landing gear was up, and properly so advised the pilot.

3. The landing gear commenced to descend as the plane was passing over the runway threshold, and Biggio promptly so advised the pilot. The pilot failed to acknowledge these advices.

4. The plane appeared to descend and level off over the center line of runway 6, at an altitude of less than 150 feet, with landing gear fully extended and flaps lowered.

5. The positions of the gear and flaps were reliably demonstrated to the pilot by indications apparent to him, within and from the cockpit.

6. The plane was committed to land straight ahead on runway 6 while making its descent over the center of the first 2,500 feet of that 5,000 foot runway.

7. When over the intersection of the east-west taxi-way the pilot attempted to "climb out"; the plane lost minimum control speed; the plane yawed to the left due to the increased drag, whereupon the pilot volitionally made a banking left turn in the direction of the yaw; the left wing fell into a spin and the plane crashed.

8. At the moment when the aircraft made its initial deviation to the left from its descending course over the center line of the runway, Biggio advised the pilot that if he was going around, he was cleared to use any runway.

9. The pilot, by reason of his experience, under the conditions confronting him, and with the benefit of the communications from the airport control tower, was free to land the aircraft safely, and, by the exercise of reasonable care in handling the plane, could have done so.

10. No advice or directive, or lack or insufficiency thereof, on the part of any of the control tower personnel, was negligent or proximately causal of the crash of the aircraft.

11. The sole proximate cause of the crash of the aircraft was the negligence of its pilot.

I conclude, therefore, that the plaintiffs have failed to discharge their burden of proof of the causes of action set forth in their respective complaints, and that each complaint should, therefore, be dismissed, with prejudice.

Let appropriate orders be submitted.

more, whereas the right wing, being lifted slightly by the lowering of the left wing, has a decreased angle of attack and therefore tends less to stall. A spin is a case of stalling in which one wing, say the left, is given a strong tendency to stall first, in that case the right wing, because of sufficient decrease in angle of attack, does not stall and so retains its lift. The left wing, losing its lift, loses its forward component of gravity, but the right wing retains its forward component of gravity and this force rotates the plane counter-clockwise."