**Anthony ZOPPI, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**PACIFIC INDEMNITY COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Nos. C 70–785, C 71–714.**

United States District Court, N. D. Ohio, E. D.

June 19, 1975.

being completed on January 8, 1975, and supplemental oral argument being heard on May 14, 1975.

This litigation arises out of the crash, on October 18, 1968, of a privately-owned, twin-engine Beechcraft Kingaire aircraft, registration number N703WC, owned by the pilot, Christopher Cordaro. The aircraft was operated at the time of the crash by Cordaro, who had owned the aircraft for approximately two months. Cordaro and all other passengers aboard N703WC were killed in the crash, which occurred at approximately 2121:16 Greenwich Mean Time (5:21:16 p. m. EDT.)

At the time of the crash instrument weather conditions existed and Instrument Flight Rules (IFR) were in effect at Cleveland Hopkins Airport, which had a ceiling of one-thousand scattered, one-thousand-six-hundred broken. Visibility was four miles with light rain and fog.

The events leading to the crash began when N703WC departed from Linden, New Jersey for a flight to South Bend, Indiana, with Christopher Cordaro as pilot in command. At approximately 2049:17 GMT, when the aircraft had already reached a point west of Cleveland, Cordaro advised that he was having engine trouble, and was trying to restart his right engine.

Shortly thereafter the Cleveland Air Route Traffic Control Center (ARTCC) Controller asked Cordaro what assistance he wanted and was told that they wanted to reverse course, and land at Cleveland. The controller then gave the aircraft vectors to Cleveland and advised that back course approaches to runway 23 were in use at Cleveland. This was acknowledged by Cordaro at 2053:08.

About six minutes later, Cordaro advised ARTCC that his right engine had started and was running all right, but that he still wanted to go to Cleveland. Approximately four minutes after that communication, Cordaro advised that he had lost his Automatic Direction Finder (ADF), a navigational instrument.

Marshall I. Nurenberg, John J. Mc-Carthy, of Komito, Nuremberg, Plevin, Jacobson, Heller & McCarthy, Cleveland, Ohio, for plaintiff.

Mark A. Dombroff, Dept. of Justice, Washington, D. C., Elliot Marks, F. A. A., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTISTI, Chief Judge.

The two above-captioned suits were filed in this Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), seeking to recover for the death of Christopher Cordaro, and for the destruction of the plane in which he had been flying at the time of his death.

Since the questions raised by both suits are identical, they were tried together to the Court without a jury, trial

N703WC was "handed off" to the arrival radar controller (AR–2) at Cleveland Hopkins at approximately 2059:00. The first contact between AR–2 and N703WC occurred at 2104:34, at which time AR–2 attempted to confirm that the aircraft had one engine out. During that communication, Cordaro advised that the engine was running periodically, but that he wanted some help to get in. He did not at that time request emergency status.

Nearly two minutes later, AR–2 again attempted to ascertain the status of N703WC, eliciting from Cordaro the statement, that, "We'd like to come straight to the airport and land at, uh, as soon as practical," adding that there was "No emergency, but we'd like some help getting in."

At 2106:53, after AR–2 had asked Cordaro whether he wanted to come straight to the airport, or if he could fly a few extra miles, Cordaro responded that, "We can fly, uh, a couple extra miles to help you out, sir." Immediately after that response, AR–2 informed Cordaro that there were "two or three" aircraft ahead of N703WC.

Upon a further inquiry by AR–2, at 2111:42, as to whether Cordaro wanted the emergency equipment standing by at the runway, Cordaro replied, "Uh, Negative."

Subsequent communications with N703WC informed Cordaro that he was 10 miles from the Stadium beacon turning inbound, and that he would be given a surveillance approach (ASR) until he had the runway in sight. This was given to assist the pilot, since he had lost his ADF, and had indicated that he didn't know if his localizer instrument was functioning properly.

At 2115:18, Cordaro advised AR–2 that his right engine was "acting up again," and was informed that he was then 13 miles from the runway. At that time he was informed that he was only three miles from Lakefront Airport, and was offered a landing there, to which

Cordaro replied, "Uh, no, we'll come into Hopkins."

When AR–2 advised N703WC, at 2116:29, that descent would commence in approximately three and a half miles, Cordaro responded that his airspeed on final approach would be 120 knots, and noted that "we are definitely losing our right engine." Immediately upon receiving that information, AR–2 stated that they would get the emergency equipment out, to which Cordaro replied, "I would."

This last communication constituted a declaration of emergency status by Cordaro. By this time, the plane preceding N703WC in line, EAL 737, was off of AR–2's frequency and in touch with the local controller for his landing clearance. Thus, AR–2 devoted full attention to N703WC from the time the emergency was declared.

Between 2117:10 and 2119:58, a steady stream of communications went back and forth between AR–2 and Cordaro. These involved announcements by AR–2 of the proper headings, altitudes, and rates of descent for the aircraft at its present position, to make corrections for inaccurate handling by the pilot, and to keep the aircraft properly aligned with the runway centerline. Cordaro responded to many, but not all, of these communications.

At 2120:23, a heading of 220° was given, the aircraft was told it was two miles out, and was also told that the recommended altitude was 2300 feet mean sea level (MSL). This altitude reading was incorrect, as the recommended altitude for that distance from the runway was 1400 feet MSL.

At the time the altitude recommendation of 2300 feet MSL was given, N703WC was actually at approximately 1400 feet MSL, and was aligned with the runway.

The next transmission to N703WC came eight seconds after the end of the incorrect altitude reading. In this communication, N703WC was told to execute

a missed approach if he didn't break out of the clouds, and climb to 3000 feet MSL.

According to eyewitness testimony, when N703WC was at approximately two miles from the end of the runway, it began to climb and execute a missed approach, a maneuver which the aircraft was capable of carrying out on a single engine with little adjustment.

Shortly after commencing its climb, N703WC was observed to go back into the clouds, and three to four seconds later exited the clouds in a spin to the right, striking the ground after three or four spins on the approximate centerline of the runway.

Plaintiffs, in this action, claim that several acts and omissions on the part of the air traffic controller, AR–2, were responsible for the crash of N703WC, and consequently the United States is liable for damages. No evidence was taken as to damages at trial, however, since liability and damages were bifurcated for trial by agreement of the parties.

Essentially, plaintiffs assert two theories of liability. First, and most directly, plaintiffs argue that the incorrect altitude reading given to N703WC was a negligent act, and proximately caused the crash by directing N703WC into a "wing vortex," which flipped the plane over and sent it out of control.

Alternatively, plaintiffs claim that a whole series of negligent acts, beginning with the failure of AR–2 to declare an emergency in advance of the time when it was, in fact, done, and culminating in the negligent altitude reading, proximately caused the crash even without the vortex encounter, by placing the pilot in a situation from which he could not recover.

The first theory of plaintiffs, that of wing vortex encounter, depends on several key factual issues. Both parties agree that the incorrect altitude reading by AR–2 was negligent; the key question is whether that act proximately caused the crash. In order to carry their burden of proof in this regard, plaintiffs must prove by a preponderance of the evidence that: (a) the preceding flight, EAL 737, was on a flight path which placed it above the path of N703WC at the point where the alleged encounter occurred; and (b), that, even if the flight paths were so aligned, a wing vortex of substantial strength created by EAL 737 would have been likely to be present at the point of the alleged encounter.

There was considerable testimony taken at trial as to the flight path of EAL 737, a Convair 440 which was on an Eastern Airlines passenger flight. Mr. Donald McClure, an EAL co-pilot, testified on behalf of the plaintiff, while Captain Chuck Anders, formerly a Convair 440 Captain, testified for the Government.

Captain Anders testified that, when conducting a backcourse localizer approach to runway 23 left at Cleveland Hopkins, as was done here, the pilot of EAL 737 would have been utilizing an approved instrument approach procedure chart. This chart, placed into evidence at trial, depicts the flight path to be followed by an aircraft in this situation. Compliance with this flight path is required by EAL procedures, as well as by Government regulations. *See* 14 C.F.R. 91.117(a).

It was clear from Captain Anders' testimony, as well as from much of the testimony elicited on cross-examination from Mr. McClure, that the controller has a right to expect that an aircraft will comply with the clearance, and be at the minimum altitudes as depicted on the approach procedure chart. *See also Bibler v. United States*, 492 F.2d 1351 (6th Cir. 1974); *Baker v. United States*, (W.D.Wash.1974).

Based on that approach procedure chart, as well as on Captain Anders' further testimony, this Court finds that, at the 2-mile point, EAL 737 was no higher than 1192 feet MSL.

The flight path of N703WC at this point is not significantly disputed.

Thus, at the 2-mile point, N703WC was clearly at an altitude of approximately 1400 feet MSL, or about two hundred feet higher than the point at which EAL 737 had passed the 2-mile point. Based on these findings of fact, this Court finds that there could not have been a wing vortex encounter, since such an encounter could occur only if the following plane were at a lower altitude than the "vortex-creating" aircraft, at the point of the alleged encounter.

However, even if the flight path of EAL 737 had been above that of N703WC, contrary to this Court's findings, any wing vortex encounter which might have occurred could not have been responsible for the crash of N703WC.

This conclusion is largely based upon the evidence given by Dr. Ralph Kodis, the Government's expert witness on this subject. The expert witness offered by plaintiffs, Dr. Eli Reshotko, admittedly was not personally knowledgeable about aircraft vortices, and certainly was not in a position to give testimony as authoritative as that presented by Dr. Kodis, who has spent the last several years in wake turbulence research.

The decisive factor leading to the conclusion that no wake turbulence encounter could have caused the crash of N703WC is that of vortex decay. Even though the vortex created by a much larger aircraft might have been significant, in this case the evidence is persuasive that the vortex created by a Convair 440 would have sufficiently decayed, in the 60 seconds separating the two aircraft, to have become indistinguishable from normal atmospheric turbulence.

Dr. Kodis testified that, for all aircraft, vortex decay reduces strength by at least half in 45 seconds, assuming low wind conditions. When, as here, the wind is approximately 10 knots, Dr. Kodis characterized the probable strength of a vortex after sixty seconds as "a burble."

Plaintiffs offered no direct refutation of this testimony, which was based on extensive field experiments conducted by Dr. Kodis. Instead, they offered only references to articles summarizing laboratory studies, and narrations of unrelated personal experiences. This Court finds that Dr. Kodis' testimony is more convincing, and finds that, by a preponderance of the evidence, a vortex encounter could not have been responsible for the crash of N703WC.

The second theory upon which plaintiffs would rest liability is more complex. Plaintiffs argue that a whole sequence of negligent events, culminating in the admitted broadcast of an incorrect recommended altitude to N703WC, placed Cordaro in a situation from which it was impossible to recover, thus proximately causing the aircraft to crash.

Of course, plaintiffs must, here, prove by a preponderance of the evidence that each alleged negligent act was, in fact, negligent, and must further establish that such acts were the proximate cause of the crash. This last question was the subject of an extensive oral argument by counsel subsequent to the close of trial, as well as extensive supplemental briefing to the Court.

The first asserted act of negligence by AR–2 was his failure to declare an emergency condition to exist prior to the time when Cordaro shut down his engines. Plaintiffs claim that Paragraph 835 of FAA Handbook 7110.8 supports this argument. That paragraph concludes that, "If you are in doubt that a given situation constitutes a potential emergency, handle it as though it were an emergency."

In this situation, however, there was no ambiguity as to the existence of an emergency. As pilot of N703WC, Cordaro at all times had sole authority to declare an emergency, pursuant to 14 C. F.R. § 91.3:

"The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." *See also Somlo et al. v. United States,* 274 F.Supp. 827 (N.D.Ill.

1967), *aff'd.* 416 F.2d 640 (7th Cir. 1969).

■ Since Cordaro specifically stated, at 2106:42 GMT, "No emergency," it is clear that he had exercised his prerogative as a pilot not to call emergency status. When he finally shut down his engine, AR–2 did properly call emergency status, pursuant to FAA regulations. There was no negligence in this aspect of the controller's behavior.

■ The next allegation of controller negligence is the failure of AR–2 to give a "wake turbulence caution." However, the evidence is clear that, as held above, the air traffic controllers relied, and were entitled to rely on EAL 737 complying with its clearance and approved approach. In those circumstances, EAL 737 would always be below N703WC. Since wake turbulence sinks, N703WC could never have been in danger from it, and no warning was required.

Finally, plaintiffs allege negligence by AR–2 in transmitting to Cordaro an incorrect recommended altitude reading. This instance of negligence is undisputed.

The sole question remaining for disposition is, therefore, this: did the negligence of the controller in giving N703WC an incorrect recommended altitude reading, proximately cause the crash of N703WC?

■■ Under Ohio law, which is controlling here, the burden is clearly on the plaintiff to produce affirmative evidence that the conduct of the air traffic controller falls below the standard represented by the conduct of reasonable men under similar circumstances, and that such conduct was the proximate cause of the injury. *See Boles v. Montgomery Ward & Co.,* 153 Ohio St. 381, 92 N.E.2d 9 (1950); Prosser, *Torts* (9th Ed. 1971), p. 238. Thus, "but for" causation, that is, merely establishing that a negligent act is a precondition of the injury, is not enough, as both parties to this lawsuit have agreed. It is not sufficient to find legal negligence that the harm would not have occurred had the actor not been negligent.

■ Further, the plaintiff may not recover if the cause of an injury may be reasonably attributed to an accident for which the defendant is not liable, as to one for which he is liable. *Krupar v. Procter and Gamble Co.,* 160 Ohio St. 489, 117 N.E.2d 7 (1954); *Gedra v. Dallmer Co.,* 153 Ohio St. 258, 91 N.E.2d 256 (1950). Thus, the plaintiff must affirmatively prove by a preponderance of the evidence that the negligent act of defendant was a proximate cause of plaintiff's injury.

■ The defendant in this case has contended that the actual, legal cause of the crash of N703WC was a loss of air speed due to improper execution of a "single engine go round" by Cordaro, stalling the aircraft. Therefore, the government has argued that any recovery by plaintiffs would be barred by the doctrine of contributory negligence. Obviously to prevail on an affirmative defense of this kind, the government must prove, by a preponderance of the evidence, that Cordaro was negligent, and that his negligence was a proximate cause of the crash.

Plaintiffs' theories as to the cause of the crash have been, first, a wing vortex encounter, as discussed (and rejected) above, and second, the "multiple negligent acts of the controller" theory here being explored. Stripped of the alleged prior acts of negligence by AR–2, rejected above, this argument contends that the incorrect altitude reading given to Cordaro by AR–2, "put the decedent in the position where he would deem it necessary in response to the incorrect altitude reading, to abort descent and attempt a single engine go-round . . . ." Thus, argue the plaintiffs, Cordaro was placed in a situation of grave danger, and "confronted with a choice between hazards, i. e. whether to attempt a continuing climb with more power or to nose down into a danger area, as he would logically understand it,

which he had just vacated pursuant to the controller's instructions."

There is one serious problem with this theory of liability, on the facts and testimony of the instant case. As Scott Crozier, one of *plaintiffs'* expert witnesses, agreed on cross-examination, "a pilot who had . . . 'proper indoctrination' on these types of maneuvers could maneuver that airplane on a single engine without any problem." Crozier further testified that the only adjustment that Cordaro would have had to make to compensate for one engine being shut down was that, "He would trim his airplane . . ." Thus, it is painfully clear that the execution of a single engine go-round maneuver by Cordaro was not a "hazard" which was forced on Cordaro by the controller's negligence, but rather a relatively simple maneuver that a well-trained pilot should have been able to execute successfully.

It is worthy of note, in this regard, that the pilot, Cordaro, never attended that portion of the Beech Ground School KingAir course at which this particular maneuver was taught. While he was a fully certified pilot, Cordaro, by his own choice, passed up the opportunity for actual flight instruction in his new KingAir, and therefore may not have been as capable of executing this maneuver as a pilot who took the complete course.

This is not a finding that Cordaro was negligent in his handling of N703WC during the single engine go-round maneuver which preceded the crash. It is entirely possible that some other event occurred, e. g. within the airplane itself, which prevented Cordaro from successfully carrying out the missed approach, which he was apparently attempting to execute. The Court does not feel that the government has proved by a preponderance of the evidence that Cordaro was, in fact, contributorily negligent.

The government has contended that *only* such negligence can explain this crash, since the behavior of N703WC is consistent *only* with a stall of the airplane, which can occur, according to the government, only through the negligent handling of the aircraft by the pilot.

Plaintiffs, in their "Supplemental Brief" (p. 10), apparently *concede* that a stall did occur: "What is known is that the aircraft came spinning out of the clouds which can only mean that it went out of control within the clouds. This can only be brought about by a loss of air speed insufficient to maintain flight."

Much opinion was elicited at trial as to whether a stall could occur *without* pilot negligence. In a case such as the one at bar, where there is absolutely no way of reconstructing the last minutes of N703WC, this Court cannot find by a preponderance of the evidence that Cordaro "must have been" negligent.

However, this same absence of facts proves fatal to the plaintiffs' contention, as well. The Court cannot presume that Cordaro "must have" been struck by a non-existent wingtip vortex; similarly, it cannot find that the incorrect altitude reading "must have" caused N703WC to crash. Merely because the aircraft did, finally, crash, this Court cannot make a *post facto* determination that the situation "must have been" unreasonably dangerous.

The testimony is beyond dispute that, with reasonable care and in the absence of any intervening factors, Cordaro should have been able to execute the missed approach which he commenced without any difficulty whatever. As the Court held in *Stratmore v. United States*, 206 F.Supp. 665, 672 (D.New Jersey 1962), "An airplane pilot is in exclusive control of his aircraft in an emergency."

This conclusion, stated another way, is simply that the negligence of the controller in mis-stating the recommended altitude to Cordaro was not proven by a preponderance of the evidence to be a proximate cause of the crash of N703WC. The cause of that crash re-

mains unknown, but, within the facts developed at trial, it cannot be attributed to any actions of the air traffic controller.

Therefore, this Court finds that the defendant was not legally responsible for the crash of N703WC, and judgment will be entered for the defendant.

The above constitute the Court's Findings of Fact and Conclusions of Law.

It is so ordered.