ANN MARIE BROWN, PLAINTIFF-RESPONDENT, v. ROBERT BROWN, TOWNSHIP OF BERKELEY, AND COUNTY OF OCEAN, DEFENDANTS, AND STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

ROBERT BROWN, PLAINTIFF, v. STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS, AND TOWNSHIP OF BERKELEY OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS.

Argued March 23, 1981—Decided June 11, 1981.

*Bertram P. Goltz, Jr.*, Deputy Attorney General, argued the cause for appellants (*John J. Degnan*, Attorney General of New Jersey, attorney; *Erminie L. Conley*, Assistant Attorney General, of counsel).

*William V. Kelly* argued the cause for respondent (*Starkey, Kelly, Cunningham, Blaney & Ward*, attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

In these automobile accident cases we are called upon to consider aspects of the State's immunity for discretionary activities under the New Jersey Tort Claims Act (Act), *N.J.S.A.* 59:1–1 *et seq.*, and the interplay of Evidence Rule 51, prohibiting the admission of remedial measures taken after an accident, with the Act's discretionary immunity provisions, *N.J.S.A.* 59:2–3.

Plaintiffs, Ann Marie Brown and her husband Robert Brown, in separate actions sued the State of New Jersey for damages for personal injuries that were incurred when, during a rainstorm, the Brown vehicle struck water in a curve on State Highway 9 in Berkeley Township, Ocean County, spun around into the opposite lane of traffic and collided with a pickup truck driven by James Ziemba. The jury found the State responsible. It awarded Mrs. Brown $225,000 and Mr. Brown $25,000. Upon the State's appeal the Appellate Division affirmed. We granted the State's petition for certification. 85 *N.J.* 467 (1981). We affirm.

I

The State's attack on the jury verdict is predicated on the assumption that the jury could not factually on the basis of the record reach conclusions consonant with the statutory discretionary immunities. Accordingly, we have reviewed the record from the viewpoint of the facts the jury could reasonably have found.

The section of Route 9 involved in this case had been constructed in 1925 and was a two-lane paved highway, one for northbound and the other for southbound traffic. The road curved eastward and in a downhill direction toward the north. The "as built" drawings show that a swale ditch (a ditch which acts as a conduit for water) had been constructed on the west side of the road at the curve. The function of the ditch was to intercept any water runoff from the ground adjoining the road and direct it away from the highway. As constructed the contour of the ditch was such that water draining from the surrounding land would not come across the highway.

Proper maintenance of a swale ditch requires periodic removal of the sand and debris that will accumulate in the swale ditch. Unless that practice is followed the swale will become nonfunctional. When Herman Rich, a civil engineer with extensive experience in the highway and traffic field, examined the road in October 1975, four months after the accident, he found the originally installed swale ditch had disappeared, the accumulated silt and debris having obliterated it. Because of the absence of the ditch, water flowed across the highway pavement in the area of the curve from west to east. During a heavy rainfall the body of water pushed ahead by a vehicle could become deep enough to cause hydroplaning, a phenomenon in which the front tires are elevated by the water and lose contact with the pavement. When that happens, steering control is lost, as Mr. Brown lost it about 11 a. m. on June 12, 1975 when his stationwagon struck the body of water that had accumulated on the road after running off from the adjacent land during a heavy rain.

Knowledge of the dangerous condition that existed at this point in Route 9 and control over that part of the roadway were conceded by the State. The State had been aware long before the accident that this condition arose during rainstorms. On February 14, 1974, the Traffic Safety Officer of Berkeley Township had written to R. Lightbody, Chairman of the Ocean County Traffic Safety Committee, in regard to this "very haz-

ardous condition on a particular section of Route 9 which [had] existed for a number of years." He indicated that the problem was caused by the water runoff across the roadway when it rained "which tend[ed] to make all vehicles hydroplane while passing through it." He enclosed 16 accident reports related to the wet roadway over a span of three years, 1971 through 1973. Mr. Lightbody forwarded this information in the form of an accident collision diagram with a letter dated April 2, 1974 to Robert J. Nolan, Chief of the Bureau of Traffic Engineering of the Department of Transportation.

A Senior Engineer in the Department conducted an investigation. In a memo dated June 27, 1974, he wrote that he had met with the Berkeley Township Police Chief and had been advised of the water accumulation at the curve of the road. He had viewed the scene and observed that the southerly approach to the curve had a one percent downgrade. It seemed to him that when combined with the super-elevation of the curve, water would flow across Route 9 at the curve. He recommended warning signs be installed and further investigation be undertaken to determine what could be done to provide better drainage.

On June 27, 1974 Mr. Lightbody was advised by Mr. Nolan's office that it had recommended installation of "Slippery When Wet" signs and that the matter had been forwarded to the Bureau of Surface Design "to determine what steps, if any, may be taken to improve drainage along the section of Route U.S. 9." On the same day, the Supervising Engineer of the Bureau of Traffic Engineering sent to the Chief of the Bureau of Surface Design, Edwin Dayton, an interoffice memo in which he wrote:

We investigated this matter and it is our opinion that rain water flowing across Route U.S. 9 at the curve results in vehicles hydroplaning through the curve. It would be appreciated if you could look into this matter and determine what action, if any, could be taken to provide better drainage along this section of roadway.

On July 29, 1974 a Project Engineer wrote to Mr. Dayton recommending "that we construct a well-defined swale . . . .

This swale should be such as to intercept and direct waters along the edge of the high side shoulder." Mr. Dayton added 15 jobs including this one to a list dated March 26, 1974 of 97 other projects. He did nothing about expediting this work because "it was nothing that was of great importance at that particular point in time." On August 1, 1974, this project was submitted along with 14 others for scheduling to John Datz, the Supervising Engineer in Area Four which encompassed eight counties including Ocean. No action was taken at that time to schedule construction of the swale.

On May 15, 1975 Dayton requested that the various area engineers review the projects and provide him with a priority listing. At that time the Supervising Engineer had a list of 23 projects. He listed the Route 9 swale ditch as number 17. He testified that he did not consider this "to be of an emergency" nature. He explained he evaluated the projects and considered whether other projects were in the same general area or were already under way. Datz also said that these priorities can be changed if "we find any problem in the priority assignment."

In an office memo dated July 7, 1975, approximately three weeks after the accident, the Chief Engineer in the design section, Frank Parker, noted the drainage situation had been investigated "approximately a year ago." He referred to the Project Engineer's July 29, 1974 report and commented that the recommendation had "not been implemented in any way."

On August 15, 1975 Mr. Parker requested a sketch for the proposed swale. On the same day, a request was made to obtain existing cross sections every 50' and topography along Route 9 as indicated on the "as built" plan, which depicted the original swale. On August 20, 1975 Edwin Dayton also requested the Supervising Engineer prepare a sketch for construction of the proposed swale. A follow-up request was made on September 26, 1975.

Prints for the construction of a swale were completed September 30, 1975. In a memo of October 2, 1975 the Regional

Engineer noted that maintenance forces would cut the swale. A work order with a diagram attached showing the length, width and depth of the swale was prepared and sent to the maintenance department in Toms River. Part of the routine functions of the maintenance department involved clearing swale ditches.

Restoration of the ditch entailed scooping up sandy gravel to a depth of 6 to 12 inches for about 400 feet. Two stakes were inserted in the ground to mark the points between which the excavation was to be made. The work was done by employees of the maintenance department stationed at a highway maintenance yard located some five or six miles away. One employee operated a front end loader; a second employee ran a dump truck to cart away debris if necessary; a third acted as a safety guard. The project took approximately 1½ days.

At the trial Herman Rich, plaintiff's expert, testified that no new survey was needed and the original plans would have sufficed. Only two elevations would be required, one where the swale disappeared and the other where it reappeared.

At the conclusion of the evidence the State moved for a directed verdict on two grounds. It contended there was no credible evidence relating to proximate cause between the dangerous condition and the happening of the accident. It also argued that the plaintiff had failed to prove that the dangerous condition was "palpably unreasonable" as required by *N.J.S.A.* 59:4–2. The trial court denied the motion and submitted the case to the jury, including the issue of whether the State's handling of the matter was "palpably unreasonable." After the verdict the State's motion for a new trial was denied.

The State then appealed to the Appellate Division, contending that it was immune as a matter of law because the decision to designate the matter as a design project rather than a maintenance job constituted "the exercise of judgment or discretion vested in the [governmental] entity" under *N.J.S.A.* 59:2–3(a) and "the exercise of discretion [regarding] the provision of adequate governmental services" under *N.J.S.A.* 59:2–3(c). It

also argued that the trial judge erred in permitting the jury to consider corrective action taken after the accident to correct the flooding situation. The Appellate Division commented that construction of the swale was nothing more than an operational determination and did not involve an "exercise of judgment or discretion" contemplated in *N.J.S.A.* 59:2–3(a). It also held that *N.J.S.A.* 59:2–3(c) did not apply because the resources necessary to alleviate the situation were clearly available. Lastly, the Appellate Division held that the proof of remedial conduct subsequent to the accident was relevant to show the feasibility of the solution.

The State sought certification limited to its claims concerning discretionary immunity under *N.J.S.A.* 59:2–3 and admissibility of the evidence of the State's action correcting the dangerous condition subsequent to the accident.

## II

The New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.*, was the legislative response to this Court's opinions in *P, T & L Const. Co. v. Comm'r Dept. of Trans.*, 55 *N.J.* 341 (1970), and *Willis v. Dept. of Cons. & Ec. Dev.*, 55 *N.J.* 534 (1970). The statute was drafted by a special task force under the aegis of Attorney General Kugler, *Report of the Attorney General's Task Force on Sovereign Immunity* (1972) (Report), and followed the basic statutory approach contained in the California Tort Claims Act of 1963, *Cal. Gov't Code* § 810 *et seq.* Report, *supra*, at 10.

The Act declares

> the public policy of this State [to be] that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration. [*N.J.S.A.* 59:1–2]

■ Both parties agree that the State's liability rests in the first instance on *N.J.S.A.* 59:4–2 which reads as follows:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

Thus a plaintiff must show (1) that the property was in a dangerous condition at the time of the accident, (2) that there was proximate cause between the injury and dangerous condition, (3) that the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred and (4) that the public entity had notice in sufficient time to protect against the condition or that the condition had been created by an act or omission of a public employee acting within the scope of his employment.

However, even if a plaintiff were to establish these four factors, he could not prevail if the action the public entity took or failed to take to protect against the condition was not palpably unreasonable. This element, the action or inaction of the public entity, refers to the public entity's discretion in determining what action should or should not have been taken. Report, *supra*, at 221. This requirement in *N.J.S.A.* 59:4–2 should be read in conjunction with *N.J.S.A.* 59:2–3(d) discussed below.

Succeeding sections in Chapter 4 deal with specific acts by the public entity. None of those sections is applicable to this case. Other than referring to a public entity's liability for failure to provide emergency signals, these sections are concerned with a public entity's immunity. See, *e. g., N.J.S.A.* 59:4–6, plan or design immunity discussed in *Costa v. Josey*, 83 *N.J.* 49 (1980).

Chapter 2 of the Act is related to immunity and liability of public entities. *N.J.S.A.* 59:2–1 states that except as otherwise provided in the Act, a public entity is not liable for an injury even though due to an act or omission of the public entity, its employee or any other person. However, *N.J.S.A.* 59:2–2 provides "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." [1] Next follows the section which is directly implicated here, *N.J.S.A.* 59:2–3. It reads as follows:

> a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;
>
> b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;
>
> c. A public entity is not liable for the exercise of discretion in determining whether or [*sic*] to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;
>
> d. A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.

The State does not rely upon subsection b. Though it had advanced a claim for immunity under subsection c before the Appellate Division, it abandoned that position before us. There was adequate and undenied proof that the State had available at all times the necessary equipment and qualified personnel to rectify the dangerous condition. Thus the State had not satisfied the requirements for immunity under that subsection.

█ The State argues that it is entitled to an immunity because of subsections a and d. This argument requires an

---

[1] This section may be compared with liability for conditions of public property under *N.J.S.A.* 59:4–2.

analysis of the interpretation and interplay of the four parts of *N.J.S.A.* 59:2–3. Each subsection should be read with respect to the subject matter of the others and in harmony with each other and with the whole. *Costa v. Josey,* 83 *N.J.* at 55; *Febbi v. Div. of Employment Sec.,* 35 *N.J.* 601, 606 (1961); *Palkoski v. Garcia,* 19 *N.J.* 175, 181 (1955); 2 *Sutherland, Statutory Construction* (4 ed. 1973), § 46.05 at 56. This approach is consonant with the general interpretative principle that the statutory language used was not intended to be redundant, lead to an untoward result, or result in surplusage. *Malloy v. State,* 76 *N.J.* 515, 520 (1978); *Hoffman v. Hock,* 8 *N.J.* 397, 406–407 (1952); *Crater v. Cty. of Somerset,* 123 *N.J.L.* 407 (E. & A. 1939).

Subsections b, c and d relate to specific circumstances. Under subsection b, immunity is given for legislative, administrative or judicial action or inaction. Subsection c is concerned, as noted above, with the exercise of discretion in determining whether to provide the resources necessary for certain purposes. Subsection d involves the exercise of discretion when, in the face of competing demands, the governmental body determines whether and how to utilize existing resources.

In sharp contrast subsection a is set forth in general terms, immunizing a public entity for injury resulting from the exercise of judgment or discretion. We recently reviewed this provision in *Costa v. Josey,* 83 *N.J.* 49 (1980) and, after analyzing both the California (*Cal. Gov't Code* § 820.2) and the federal (28 *U.S.C.A.* § 2680(a)) statutes as expounded by pertinent judicial decisions, concluded that the exemption under subsection a concerns the "'exercise of judgment or discretion'" in making basic policy—the type made at the planning, rather than the operational, level of decisionmaking. 83 *N.J.* at 59.

The State vehemently argues that the project involved design engineering rather than maintenance. Even if that position were adopted, the State's reliance on subsection a would be misplaced. When an immunity comes within a specific subsection of *N.J.S.A.* 59:2–3, then the general provision, subsec-

tion a, would not apply. See *W. Kingsley v. Wes Outdoor Advertising Co.*, 55 *N.J.* 336, 339 (1970); *State by Highway Com'r v. Dilley*, 48 *N.J.* 383, 387 (1967); *State v. Hotel Bar Foods*, 18 *N.J.* 115, 128 (1955). Here the State's showing falls well within the factual confines of subsection d. The State has agreed that the road condition was dangerous, that the highway was under its control, that it was aware of the precarious situation, and that it intended to take corrective measures. Its defense has been that it was confronted with competing demands for other projects which had been accorded priority. The State does not contend that it did not have the necessary equipment or the qualified manpower to do the job. Under these circumstances subsection d is brought into play and subsection a would be inapplicable. No implication should be drawn that, if subsection d did not apply, immunity would automatically be available under subsection a. Questions of a different nature would then become pertinent. See *Costa v. Josey*, 83 *N.J.* 49 (1980).

■ Applicability of subsection d, namely, the State's exercise of discretion with respect to when it would proceed, does not *per se* establish immunity, for immunity is not available if "a court concludes that the determination of the public entity was palpably unreasonable." The record substantially justifies the jury's conclusion that the determination was "palpably unreasonable." Decisionmaking as between and among authorized projects was apparently left to the Supervising Engineer in the geographical area involved. Though this project was transmitted to him in August 1974, he did not consider its urgency or evaluate the extent and nature of the work. It was simply added to the list. In May 1975, he reviewed 23 projects and placed this as number 17 on the list. It was the State's burden to demonstrate that the items given a higher priority were more critical. See *Williams v. Phillipsburg*, 171 *N.J.Super.* 278 (App. Div. 1979). No satisfactory explanation was forthcoming for the low priority given to this item in relation to those placed ahead of it. In

this respect the State did not show that its action was not palpably unreasonable.

· [7] Moreover, the overwhelming evidence supports the conclusion that the Department's scheduling determination not to proceed sooner was palpably unreasonable. The Department knew of the substantial number of accidents that had occurred at this curve in the road. It was fully aware of the danger of vehicles hydroplaning because of the rain water being directed onto the highway. It had available the "as built" drawings reflecting the swale ditch that could readily be compared with an onsite inspection. A front loader and qualified maintenance personnel located at a nearby maintenance yard were accessible. Calculation of the time required to do the job, which had become necessary because of failure to maintain the swale ditch, could easily have been made and would have disclosed the short period needed to restore the swale ditch. The delay in responding to the dangerous condition which had been brought to the Department's attention in April 1974 and which had not been rectified by cleaning out the ditch before June 12, 1975, the date of the accident, was palpably unreasonable. Thus the State is not immune from liability for a discretionary determination which was palpably unreasonable as to "whether and how to utilize or apply existing resources."

The phrase "palpably unreasonable" appears in *N.J.S.A.* 59:4–2 as well as in *N.J.S.A.* 59:2–3. In the former it relates to the action taken or omitted by the public entity. Thus, if that action or inaction were not palpably unreasonable, the plaintiff would be barred from recovery. In the latter provision the public entity is immune from liability resulting from its exercise of discretion with respect to competing demands if its exercise of that discretion has not been palpably unreasonable.

These two subsections may under some circumstances involve the same issue, as in this case. The plaintiffs have never contended that the work was performed improperly. Their negligence charge was the unreasonable time delay in correcting

the dangerous condition. The State in response has argued that the time lag was due to competing demands. Accordingly, the same conduct was to be measured in terms of palpable unreasonableness under both *N.J.S.A.* 59:4–2 and *N.J.S.A.* 59:2–3.

■ During oral argument the Court raised *sua sponte* the question of whether the determination of palpable unreasonableness is for the court or the jury. The language under *N.J.S.A.* 59:2–3 places that burden on the court and conforms with the proposition in the Act when originally enacted that tort claims against a public entity were to be heard by a judge without a jury. *L.* 1972, *c.* 45, § 59:9–1. However, this was amended in 1975 to provide for a jury trial where an appropriate demand was made. *L.* 1975, *c.* 3, § 1. No corresponding amendment was made in subsection d of *N.J.S.A.* 59:2–3. As noted above on occasion the same issue of palpable unreasonableness may arise under *N.J.S.A.* 59:2–3 and *N.J.S.A.* 59:4–2. Since it would be incongruous to have both the court and jury decide the same issue, it appears that the Legislature inadvertently failed to amend *N.J.S.A.* 59:2–3. We shall therefore interpret the section in accordance with the legislative intent. Here the jury made the necessary finding of palpable unreasonableness, a finding amply supported by the record.

### III

■ The State contends that, even if it was not immune and its conduct were to be evaluated by a jury, it was prejudicial error to permit into evidence, contrary to Evidence Rule 51, proof of repairs made after the accident. Evidence Rule 51 reads as follows:

> When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

This rule is predicated on the public policy of encouraging subsequent remedial measures, *Perry v. Levy*, 87 *N.J.L.* 670, 672 (E. & A. 1915), and on the unreliability of any inference of an

admission of culpability by the defendant. *Wigmore on Evidence* (3 ed. 1940), § 283 at 151.

Evidence Rule 51 excludes relevant evidence only if that evidence is used "to prove negligence or culpable conduct." Thus, where such evidence is offered for relevant purposes other than negligence or culpable conduct, it is admissible. This was a well-established principle when Evidence Rule 51 was adopted in 1967. See *Perry v. Levy,* 87 *N.J.L.* 670 (E. & A. 1915). The Report of the New Jersey Supreme Court Committee on Evidence, March 1963, states that "Rule 51 follows traditional law." *Id.* at 96. The Report further explains that "[t]he Rule, by excluding remedial conduct relevant only to negligence or culpable conduct, does not bar it as evidence relevant to other issues, such as control over a machine, the feasibility of making repairs, and similar questions." *Id.* at 97. Thus evidence of subsequent remedial action has been admitted to show control, *Perry v. Levy,* 87 *N.J.L.* 670 (E. & A. 1915); *Manieri v. Volkswagenwerk,* 151 *N.J.Super.* 422 (App. Div. 1977), certif. den., 75 *N.J.* 594 (1978); *Reid v. Monmouth Oil Co.,* 42 *N.J.Super.* 355 (App. Div. 1956), to impeach the credibility of a witness, *Hansson v. Catalytic Constr. Co.,* 43 *N.J.Super.* 23 (App. Div. 1956), and to demonstrate feasibility and practicability of repair, *Bailey v. Kawasaki-Kisen, K.K.,* 455 *F.2d* 392 (5 Cir. 1972); *Tyler v. Dowell, Inc.,* 274 *F.2d* 890 (10 Cir. 1960), *cert.* den., 363 *U.S.* 812, 80 *S.Ct.* 1248, 4 *L.Ed.2d* 1153 (1960); *Johnson v. United States,* 163 *F.Supp.* 388 (D. Mont. 1958), aff'd 270 *F.2d* 488 (9 Cir. 1959), *cert.* den., 362 *U.S.* 924, 80 *S.Ct.* 677, 4 *L.Ed.2d* 742 (1960).

Federal Rule of Evidence 407 also provides that evidence of subsequent measures is not admissible to prove negligence or culpable conduct. In addition, it expressly provides that such evidence is admissible when offered for another purpose, such as proving "ownership, control or feasibility of precautionary measures, if controverted, or impeachment." Fed. Rules Evid. Rule 407, 28 *U.S.C.A.* Since the same principle is applicable to our Evidence Rule 51, reference to federal deci-

sions relating to feasibility is pertinent. In *Bailey v. Kawasaki-Kisen, K.K.*, 455 *F.*2d 393 (5 Cir. 1972), a federal court held that evidence of the ease with which a dangerous condition resulting from grease build-up on a winch mechanism was repaired was admissible to show the practicability of preventing the accident. Similarly, in *Tyler v. Dowell, Inc.*, 274 *F.*2d 890 (10 Cir. 1960), *cert.* den., 363 *U.S.* 812, 80 *S.Ct.* 1248, 4 *L.Ed.*2d 1153 (1960), a subsequent change in the size of the nipple on the frack head mounted on an oil well was admissible to show that such a change was feasible.

In the instant case the disputed evidence demonstrating that the swale ditch was reconstructed within a day and a half with one employee operating a front end loader was relevant in resolving whether the State's delay in scheduling the project was palpably unreasonable and also in demonstrating that the work was essentially maintenance rather than design. As such, it was clearly admissible.

At the outset of the trial the State had moved to prevent admissibility of evidence of the State's remedial action. Decision was reserved until all other facts of liability were produced by plaintiffs and the State. When ruling that the evidence was admissible, the trial court observed that the State's legal position of immunity involved exercise of its discretion in scheduling and that the State had introduced evidence of its intent to correct the dangerous condition. Under those circumstances the State could not claim it was prejudiced by the introduction of subsequent repairs insofar as its negligence or culpable conduct with respect to the condition itself was concerned. We agree with the trial court's observation and ruling.

The judgment is affirmed.

*For affirmance*—Chief Justice WILENTZ, and SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER, and POLLOCK, Justices—7.

*For reversal*—None.