263 N.J. Super. 66 (1993)
621 A.2d 972
THOMAS BERENDS, EXECUTOR OF THE ESTATE OF MARY GORRERA BERENDS; TIMOTHY BERENDS, AN INFANT BY HIS GUARDIAN AD LITEM, THOMAS BERENDS; AND THOMAS BERENDS, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
CITY OF ATLANTIC CITY; PAN AM WORLD AIRWAYS, INC.; INTERNATIONAL TECHNICAL AVIATION PERSONNEL, INC.; ROBERT C. BENTLEY; ARNOLD W. EBBERUP; EDWIN SAFER; XYZ COMPANIES AND JOHN DOES (IDENTITIES UNKNOWN), DEFENDANTS-RESPONDENTS. WILLIAM EAVERS; CHARLOTTE BOLANDER, AS EXECUTOR OF THE ESTATE OF RAYMOND BOLANDER; NOEL BOLANDER, AN INFANT, BY HIS GUARDIAN AD LITEM, CHARLOTTE BOLANDER AND MICHELE BOLANDER, AN INFANT BY HER GUARDIAN AD LITEM, CHARLOTTE BOLANDER; AND CHARLOTTE BOLANDER, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
CITY OF ATLANTIC CITY; AND THEIR JOHN DOES, EMPLOYEES, AGENTS, SERVANTS AND CONTRACTORS 1 THROUGH 100; PAN AM WORLD AIRWAYS, INC., AND THEIR JOHN DOES, EMPLOYEES, AGENTS, SERVANTS AND CONTRACTORS; INTERNATIONAL AVIATION PERSONNEL, INC. AND THEIR JOHN DOES, EMPLOYEES, AGENTS, SERVANTS AND CONTRACTORS; ROBERT C. BENTLEY; ARNOLD W. EBBERUP; EDWIN SAFER; XYZ COMPANIES 1 THROUGH 25 AND RICHARD DOES 1 THROUGH 100 (IDENTITIES UNKNOWN), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1992.
Decided March 16, 1993.
*68 Before Judges LONG, D'ANNUNZIO and KEEFE.
Harrison J. Gordon argued the cause for appellants William Eavers and Charlotte Bolander, et. al. (Gordon & Gordon, attorneys).
Alan Roth argued the cause for appellant Thomas Berends (Bendit, Weinstock & Sharbaugh, attorneys).
Charles J. Daly argued the cause for respondents Pan Am World Airways, Inc., International Technical Aviation Personnel, Inc., Robert C. Bentley, Arnold W. Ebberup and Edwin Safer (McKissock & Hoffman, attorneys).
*69 Maurice Y. Cole, Jr., argued the cause for respondent City of Atlantic City (Cole & Cole, attorneys).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
In these consolidated death and personal injury actions, plaintiffs appeal from summary judgments in favor of all defendants.
On August 27, 1986, a small aircraft crashed killing the pilot, Raymond Bolander, and a passenger, Mary Berends, and seriously injuring William Eavers, another passenger. The pilot was attempting to land the aircraft at Bader Field in Atlantic City, New Jersey, on runway 11-29 somewhere between 12:02 and 12:25 a.m.[1] On the date of the accident, the pilot was a "low time pilot," with 130 hours of total flight time, 40 of which were logged at night while flying in and out of Bader Field. The pilot was operating under Visual Flight Rules (VFR).[2]
According to the surviving passenger, William Eavers, as the pilot attempted to land the plane, he was able to keep the nose pointed towards the runway and the wings level. After the plane touched down, it bounced several times and began moving to the left to a point where the left wheel of the landing gear went off the runway. Apparently, the pilot then attempted to get the plane back on the runway, however, according to Eavers, it felt like the aircraft continued to be pushed off the runway. Halfway down the runway, the pilot aborted the landing and attempted a "go-around." The aircraft gained altitude, banked to the left and then suddenly headed nose down into the ground about one-half mile from the end of the runway.
*70 Bader Field is a municipal airport owned by the City of Atlantic City. It has two runways, runway 11-29 and runway 4-22. At the time of this accident, runway 4-22[3] was closed and had been closed since May 17, 1986 following an aircraft crash that resulted in fatalities both on board the aircraft and on the ground. At the time of the accident in the present case, the pilot was aware that runway 4-22 was closed and that runway 11-29 was the only runway in use. Bolander's inability to keep his aircraft on the runway is attributed to a strong crosswind blowing out of the south, or slightly west of south. Bolander had landed on runway 11, i.e., a heading of 110° . Thus, the crosswind would have struck the aircraft approximately perpendicular to its line of travel.
Dale Leppard, plaintiffs' liability expert, contended that defendants International Aviation Personnel (ITAP), Robert Bentley, Arnold Ebbenrup and Edwin Safer were negligent in their operation of the control tower. ITAP is a private air traffic control corporation which provides trained air traffic controllers at non-federally controlled towers. Robert C. Bentley is president of ITAP. Arnold Ebberup was manager of the control tower and Edwin Safer was the air traffic controller on duty on the night of the accident. The tower closed at midnight each day. Leppard contended that if Bolander had attempted to contact the tower before midnight and it had closed early, there should be liability on the part of the tower operators because if they had been there, they could have provided wind information which would have enabled the pilot to make a choice to land at another airport.
According to Eavers, Bolander contacted Bader Field for instructions when they were approximately ten to twelve miles *71 out.[4] Eavers did not remember what the response was from the tower.
Edwin Safer was on duty in the control tower on August 26, 1986 from 4:00 p.m. until midnight. Safer had no recollection of receiving any transmissions from the aircraft. The tower recording from the night in question was unavailable, apparently it had been destroyed by mice while in storage.
According to the report of the National Transportation Safety Board (NTSB) the extent of the pilot's communications during the flight were as follows:
The pilot, during this flight, did not file a flight plan, and had not made radio contact with any ground facility. His arrival at Bader Field was after the control facility at Bader Field had secured for the night. He did contact the fixed base operator, Butler Aviation, which by their corporate policy, is to only issue the runway that was in use after the control facility secures operation. They do not provide weather or wind information either to aircraft in flight or on the ground. Their night dispatcher stated that aircraft N4571Q had contacted Butler Aviation UNICOM, and was advised that the runway in use was Runway 11. The pilot acknowledged this information.
Leppard's second theory of liability concerns the City of Atlantic City and Pan Am. He contended that the accident was proximately caused by the closing of runway 4-22. In his report, Leppard stated:
In my opinion, the closing of Runway 4-22 created a dangerous condition, and therefore was the proximate cause of this accident. As a result of the proximity of the airport to the ocean, the direction of the prevailing winds was reasonably foreseeable. Due to the direction of the prevailing winds, Runway 4-22 would have been the normally preferred runway for takeoffs and landings, providing a much lower crosswind component.
In his deposition, Leppard testified that it was his opinion that had runway 4-22 been available for use by the pilot, the crosswind component would not have been a factor and this accident would not have happened. He testified that an airport should accommodate all pilots who may use it and if it does not *72 the airport is unsafe. According to Leppard, the fact that runway 4-22 was not available was a direct causal factor in the accident.
Nonetheless, Leppard did admit that he did not believe that all one-runway airports are unsafe. He further stated he was not contending that for an airport to be safe it must always have a runway to enable any student or pilot to land safely. Indeed, Leppard stated that:
A pilot has to make a judgment whether he can land safely or not, and he has to make that determination, and I believe that in this particular case that the pilot did make that determination that he could land safely and, in fact, he did land safely. It wasn't until ... after he was on the ground that the unsafe condition became evident to him.
Leppard also conceded that the pilot "obviously made an error during the attempted go-around phase" which most likely caused an aerodynamic stall[5] and resulted in the crash. Further, *73 Leppard explained that he was not contending that Pan Am had the power to open or close the runway. It was his understanding that only the City of Atlantic City had the power to do so. He claims, however, that Pan Am should have been more insistent that the city reopen runway 4-22 because it would have made the airport safer.
Pan Am Management Systems, Inc. assumed control of the operations of Bader Field on June 1, 1986, pursuant to a contract with the city.[6] It was the understanding of Pan Am that runway 4-22 was to remain closed indefinitely. According to Stephen Williams, vice president of Pan Am Management Systems and project manager for the Atlantic City airports, the City Council Transportation Committee had indicated that Pan Am could not reopen runway 4-22 without the permission of the mayor or city council. It was his understanding when Pan Am took over operations on June 1, 1986 that runway 4-22 was shut down and not operational. However, he never received or saw anything in writing closing the runway.
After assuming operational control of Bader Field, Pan Am undertook an evaluation of the airport's parameters with the intention of making recommendations that would enhance the airport's safety. In a letter dated June 19, 1986, Frederick Ford, vice president of Pan Am World Services, Inc., wrote to *74 the mayor and members of the city's transportation committee. In his letter, he enclosed a summary of Pan Am's evaluation and recommendations to enhance safety at Bader Field, which were based on a 1983 Federal Aviation Administration (FAA) study. The letter proposed holding public hearings to solicit full public input. He also noted that this effort was particularly critical in light of the aircraft accident of May 17, 1986 and the shared concern about the safety of the airport's users and its neighbors.[7]
We attach as an appendix to this opinion a copy of Pan Am's evaluation report titled Bader Field Operational Recommendations, consisting of six pages. Pan Am's recommendations included the exclusion of certain aircraft from Bader Field and shifting their operation to Pomona Airport, a larger facility located several miles away. These aircraft were multi-engine aircraft with approach speeds greater than 91 knots. Pan Am recommended reopening runway 4-22, but that runway 4 not be used for arrivals and that runway 22 not be used for departures.
By letter dated July 3, 1986, Richard Squires, Atlantic County Executive, informed Pan Am that he concurred with its recommendations for safety improvements at Bader Field. He also noted that he would support Pan Am's efforts to preserve and improve Bader Field provided the FAA and the N.J. Department of Transportation, Division of Aeronautics concurred with Pan Am's recommendations.
Public meetings were held on July 17, 21 and 22, 1986 at which Pan Am presented and discussed its "Proposal for a Safer and Quieter Bader Field." On August 6, 1986, Samuel Smith, General Manager of Pan Am, wrote to Mayor Usry summarizing the public and professional comments received on Pan Am's proposal to make Bader Field a safer and quieter *75 airport. In the same letter he also addressed a July 24, 1986 joint meeting held with the FAA and N.J. Division of Aeronautics. The FAA had expressed concern about opening only half of runway 4-22 as proposed by Pan Am. In addition, the FAA was independently reviewing the Bader Field situation and as such would offer additional recommendations in the future.
On August 29, 1986, two days after the Bolander crash, the FAA issued its final report titled "A Review of Safety Improvements at Bader Field, Atlantic City, New Jersey" which was prepared by the FAA in cooperation with the N.J. Department of Transportation, Division of Aeronautics and Pan Am. The FAA's position with regard to the use of runway 4-22 was as follows:
Atlantic City closed Runway 4-22 as a result of the public reaction to the May 17, 1986, accident. FAA is currently working with airport management to reopen the runway. (Certain damage caused by the accident must be corrected.)
As indicated on the attached proposal, Pan Am plans a preferential runway use program and a prohibition on takeoffs on Runway 22 and landings on Runway 4.
While FAA can concur with a continuance of a prohibition on Runway 22 takeoffs and Runway 4 landings by aircraft that are unable to demonstrate compatibility with its short runway length ..., and restricted use by others in accordance with a preferential runway use program, all uses of Runway 4-22 must be made available to pilots when crosswinds are excessive on Runway 11-29.
By a September 3, 1986 resolution of the City Council of Atlantic City, runway 4-22 was reopened for limited use in accordance with Pan Am's recommendations.
The trial court, in granting summary judgment ruled that defendants' actions were not the proximate cause of the crash because the pilot broke the "causal chain" when he attempted "a go around." There is support for this ruling in federal aviation jurisprudence. See In re Air Crash at Dallas/Fort Worth Airport, 919 F.2d 1079 (5th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991); Wenzel v. United States, 419 F.2d 260 (3rd Cir.1969); Stratmore v. United States, supra, 206 F. Supp. 665 (D.N.J. 1962).
*76 The court also determined that the city's decision to close runway 4-22 was cloaked with immunity as a discretionary decision under N.J.S.A. 59:2-3a, and that Pan Am enjoyed derivative discretionary immunity.
We now affirm the summary judgment in favor of Atlantic City.
Plaintiffs' theory of liability against the city is that the closing of runway 4-22 created a dangerous condition because runway 11-29 was subject to strong crosswinds, a condition which rendered it unsafe. In New Jersey, public entities are "liable for their negligence only as set forth in the Tort Claims Act." Pico v. State, 116 N.J. 55, 59, 560 A.2d 1193 (1989). N.J.S.A. 59:2-1 provides that a public entity is not liable for an injury "[e]xcept as otherwise provided by this act" and that "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity."
Plaintiffs rely on N.J.S.A. 59:4-2 which defines public entity liability for a dangerous condition of its property. It provides:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
We address the last paragraph of this section which shields the entity from liability if its action or omission was not palpably unreasonable. We assume, but only for purposes of this analysis, that the unavailability of runway 4-22 created a dangerous condition as defined in N.J.S.A. 59:4-1a and as plaintiffs alleged. The issue then is whether the city's action in *77 not reopening runway 4-22 until September 1986 was palpably unreasonable.[8]
The Tort Claims Act does not define the phrase "palpably unreasonable." See generally Birchwood Lakes Colony Club, Inc. v. Medford Lakes, 90 N.J. 582, 594-96, 449 A.2d 472 (1982) (public entity can be found liable in nuisance for water pollution if its actions were palpably unreasonable); Brown v. Brown, 86 N.J. 565, 580, 432 A.2d 493 (1981) (jury could find that State's failure to implement decision to correct drainage problem on highway in a timely manner was palpably unreasonable). However, our Supreme Court described its boundaries in Kolitch v. Lindedahl, 100 N.J. 485, 493, 497 A.2d 183 (1985):
For today's purposes we accept what was stated in Williams v. Phillipsburg, 171 N.J. Super. 278, 286 [408 A.2d 827] (App.Div. 1979), in which the court differentiated the term "palpably unreasonable" from ordinary negligence:
We have no doubt that the duty of ordinary care, the breach of which is termed negligence, differs in degree from the duty to refrain from palpably unreasonable conduct. The latter standard implies a more obvious and manifest breach of duty and imposes a more onerous burden on the plaintiff.
We conclude that the term implies behavior that is patently unacceptable under any given circumstance. As one trial court has suggested, for a public entity to have acted or failed to act in a manner that is palpably unreasonable, "it must be manifest and obvious that no prudent person would approve of its course of action or inaction." (citations omitted) Moreover, the burden of proof with regard to the palpable unreasonableness of the State's action or inaction is on the plaintiff in a case of this type. (citations omitted)
Applying those boundaries, we conclude that the city's decision not to reopen runway 4-22 until it considered and evaluated the available options was not palpably unreasonable.
The record reveals that Bader Field was a small general aviation airport whose use increased with the advent of casino gambling in Atlantic City. In addition to an increase in the frequency of its use, Bader Field expanded from a general *78 aviation airport to one serving passengers as well. But Bader Field's expanded role was not without its problems. They were recognized in 1983, approximately five years after the first casino opened, in a report by the FAA, titled Atlantic City Airports Role Study (hereinafter Study).
The Study described, evaluated and compared the different roles of Bader Field and Pomona Airport. Bader Field is the more limited facility. It is located about one mile west of Atlantic City in an urban environment. Pomona Airport, located several miles west of Bader Field, is much larger and more sophisticated. To convey a measure of the differences between Pomona Airport and Bader Field we reproduce from the Study, the FAA's summary evaluation of each facility's prospective role:
Bader Field
A primary Commercial Service airport for commuters (haul lengths of 230 miles and less).
A General aviation airport for single engine and light twin aircraft.
Restricted to aircraft with approach speeds of less than 91 knots.
Pomona Airport
An FAA R & D Test Facility.
Support of the U.S. Defense mission of the U.S. Air Force/New Jersey Air National Guard.
An Air Carrier airport accommodating Atlantic City medium and long haul needs.
Commuter activity accommodating overflow from Bader comprised of excess demand, weather diversions and aircraft that should not operate at Bader and a feeder role for local population needs when scheduled service develops.
General Aviation accommodation for all aircraft types including those that should not operate at Bader Field.
Most pertinent to our analysis, however, the FAA expressed concern regarding Bader Field's short runways and urban environment. The Study's recommendation included the following:
With regard to high-rise construction, Atlantic City and the FAA must work closely so that redevelopment can continue without undue impediment and the airport can continue to safely and efficiently serve the city. The FAA recommends a long-term agreement with the city that:
All height zoning waiver requests be coordinated with FAA.
All changes to the height zoning be coordinated with the FAA.

*79 With such a cooperative approach, both redevelopment and aviation needs can be well served.
Certain aircraft ought not to be operating at Bader Field because of the short runway length available and increasingly restricted maneuvering airspace. Airport Management should develop a plan in cooperation with FAA to phase out operation of aircraft that cannot operate within the runway length available and obstacle clearance requirements of the close-in airspace.
In 1985, the FAA again expressed its concern about Bader Field's urban location and short runways. In March of that year, Joseph M. Del Balzo, of the FAA wrote to then Atlantic City Mayor Usry. We reproduce the letter in its entirety:
Dear Mayor Usry:
I would like to, at this time, reiterate our concern with maintaining an adequate level of safety at Bader Field. While all of the recommendations involving safety contained in our Atlantic City Role Study, and subsequent letters, deserve attention, recent incidents at the airport highlight the need to proceed now with certain items. Of particular concern is, limiting the airport to aircraft that are capable of consistently operating safely in varying ambient conditions on the short runway length available and within the increasingly restricted maneuvering airspace at Bader Field. In our study, we recommended a City plan, developed in concert with FAA and the airport users, to accomplish this objective. We believe such a plan to be feasible due to the availability of the airport at Pomona as an alternative for aircraft that should not use Bader, and recommend immediate development of such a plan.
In addition, we would like to strongly recommend, and will support a Grant application (using entitlement funds) for grooving the runways. Grooving will markedly improve braking action and reduce water on the runways; both of which are highly desirable given the short runways, varying ambient conditions and current forecast activity levels at Bader Field.
These issues, with safety implications, (and others such as establishing a designated helipad at the airport to segregate fixed and rotary-wing aircraft) must be treated as immediate action items and implementation cannot wait for the upcoming study of the Atlantic City Airports.
I believe, therefore, that a complete joint FAA/City review of our recommendations and on-going projects at the working level is in order, and request, therefore, that your Director of Transportation contact Brian J. Vincent, Manager, Airports Division, to arrange a meeting for this purpose.
I assure you that my staff is available for any technical assistance in furthering these important projects.
The concerns expressed in the letter were well-founded. As previously indicated, on May 17, 1986, a Cessna 414A crashed beyond runway 4-22 in what the FAA characterized as a "Takeoff overrun accident." Edward Goddard, Pan Am's airport *80 manager, described the May 17, 1986 crash as follows: "An aircraft aborted its take-off [sic] of runway 22, lost its elevation, came down into the Albany Avenue fence, shot across Albany Avenue into Boulevard Avenue." Crash debris killed a policeman who was sitting in his car on a public street and threatened a residential neighborhood.
According to the FAA, this was the fourteenth accident involving fatalities, other serious injury, or substantial aircraft damage at Bader Field since July 1980. The FAA's list did not include sixteen other incidents on record with the New Jersey Department of Transportation. One of those incidents included four fatalities on an aircraft "that was inbound to Bader Field and went down in the ocean."
Based on this record, we conclude that plaintiffs have not carried their burden of establishing that the city acted in a palpably unreasonable manner in keeping runway 4-22 closed until September. Bader Field had significant safety problems which were catalogued in the FAA's 1983 Study and highlighted in Del Balzo's 1985 letter of concern. The May 17, 1986 crash, resulting in the death of a person on the ground beyond the airport, was a justifiable catalyst to the city's re-evaluation of the risks inherent in the continued operation of runway 4-22 and the other aspects of Bader Field's operations.
The record establishes that the city acted deliberately and responsibly in seeking and receiving input from Pan Am, the FAA and the public before it restored Bader Field to its level of operations prior to the May crash. As previously indicated, the FAA did not issue its final report until August 29, 1986, two days after the crash at issue. Moreover, the evaluation process in which the city engaged resulted in substantial safety-oriented changes in Bader Field's operations, including limits on use of the reopened runway 4-22 and a ban on certain types of aircraft. We are persuaded that a jury could not conclude that the unavailability of runway 4-22 during the summer of 1986 was "patently unacceptable under any given circumstance" *81 Kolitch, supra, 100 N.J. at 498, 497 A.2d 183, or that it was "manifest and obvious that no prudent person would approve of its course of action or inaction." Ibid. In reaching this conclusion we are also mindful of the availability of Pomona Airport as an alternative landing site to accommodate aircraft, including Bolander's craft, during the period runway 4-22 was closed.
The facts described above also persuade us that the city enjoyed immunity under N.J.S.A. 59:2-3a which provides that "[a] public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity." This section immunizes "high-level policymaking decisions involving the balancing of competing considerations." Costa v. Josey, 83 N.J. 49, 55, 415 A.2d 337 (1980). Examples of "high level policy determinations ... entitled to immunity," Id. at 56, 415 A.2d 337, are "`whether a road should have four or six or eight lanes', or should have `dividers or circles or jughandles for turns, or traffic lights, or traffic policemen.'" Id. (quoting Fitzgerald v. Palmer, 47 N.J. 106, 109-10, 219 A.2d 512 (1966)).
In Costa, the Court further defined the scope of § 3a immunity by describing immunized decisions as "the type made at the planning, rather than the operational level of decision-making." Costa, supra, 83 N.J. at 59, 415 A.2d 337. The Court also explained that the "immunity is contingent upon proof that discretion was actually exercised at that level by an official who, faced with alternative approaches, weighed the competing policy considerations and made a conscious choice." Ibid.
Whether, and under what conditions, runway 4-22 should reopen was a high-level policy determination made at the planning level by the city's governing body. The inference is inescapable that the decision to close the runway was made by then Mayor Usry as an appropriate and immediate response to the May 1986 crash. Thereafter, the continued closure of the runway until September 3, 1986 was justified while the city's governing body, "faced with alternative approaches, weighed the competing policy considerations and made a conscious *82 choice." Ibid., regarding those alternatives based on input from Pan Am, the FAA and the public. To have reopened the runway prematurely would have aborted the policy making process essential to § 3a immunity.
We also affirm the judgment in favor of Pan Am, although we do not hold, as did the trial court, that Pan Am enjoyed derivative immunity, as that principle has been applied in New Jersey. Compare Rodriguez v. N.J. Sports & Exposition Auth., 193 N.J. Super. 39, 472 A.2d 146 (App.Div. 1983), certif. denied, 96 N.J. 291, 475 A.2d 586 (1984), and Cobb v. Waddington, 154 N.J. Super. 11, 380 A.2d 1145 (App.Div. 1977), certif. denied, 76 N.J. 235, 386 A.2d 859 (1978), with Vanchieri v. N.J. Sports & Exposition Auth., 104 N.J. 80, 514 A.2d 1323 (1986). In Rodriguez and Cobb we ruled that contractors hired by the public entity were cloaked with the entity's immunity in performing their contracts. In Vanchieri, however, the Supreme Court reversed a judgment for the contractors. The issue was remanded to determine whether the contractor had been required to perform in accordance with detailed specifications established by the entity and, if so, whether the contractor had deviated from those specifications. In the present case, we are unable to engage in a Vanchieri analysis because the parties have not provided us with a copy of the contract between the city and Pan Am, nor does it appear that the contract was part of the record on which the trial court decided the summary judgment motions.
Nevertheless, our analysis of the city's liability is pertinent to the claim against Pan Am. As previously indicated, runway 4-22 had been closed by the city in the aftermath of the May crash. Pan Am assumed the management of Bader Field and Pomona Airport on June 1, 1986. At that time Bader Field had one operating runway. One of the first issues confronting Pan Am was whether and under what circumstances runway 4-22 should be made operational. Even if we assume that Pan Am had unilateral authority to reopen the runway, as plaintiffs *83 contend,[9] Pan Am should not be faulted for deferring to the city's decision to keep the runway closed based on the city's extensive experience in operating Bader Field. Instead of acting unilaterally, Pan Am made its decision responsibly in concert with the airport's owner, the FAA, the N.J. Division of Aeronautics and the public. Thus, Pan Am engaged in and made a significant contribution to the process which, as we have held, shields the city from liability. It would be anomalous to punish Pan Am for postponing the reopening of runway 4-22, when the postponement resulted from its participation in a thoughtful and professional multiagency evaluation process upon which the city's immunity is founded.
There is no evidence of any inordinate delay in reopening the runway. Pan Am issued its evaluation report nineteen days after it assumed its duties, held public meetings in July, met with representatives of the FAA and the Division of Aeronautics during that summer and assisted in the drafting of the September 3, 1986 resolution which reopened runway 4-22 subject to the limitations described by Pan Am in its June 19 report.
Based on this record we perceive of no basis for holding Pan Am liable, particularly in light of the pilot's awareness of Bader Field conditions, including the unavailability of runway 4-22 and the availability of Pomona Airport.
We also affirm the summary judgment in favor of the control tower defendants. If, contrary to the NTSB report, Bolander did communicate with the tower, there is no evidence of what the tower told Bolander because Eavers did not hear the tower or does not remember what he heard. Consequently, there is no basis to conclude that Bolander received inadequate information or misinformation from the tower.
*84 If, on the other hand, the tower had closed early it could not give Bolander information such as wind velocity and direction. We perceive of no basis for liability on that ground because there were other sources for that information available to Bolander, including Pomona Airport. The record also indicates that the pilot of a light aircraft will become aware of wind conditions from the wind's effect on his aircraft. During his deposition, Leppard stated:
You have a chance to evaluate the winds on approach. You have a chance to decide whether or not those winds are too great for the capability of your aircraft. Obviously they were not because he did land the aircraft by whatever method he used to compensate for the crosswinds. He did manage to get it onto the end of the runway, which means whatever method he used, up to that point he did it right. His problem didn't really begin until on the ground, then it became evident that even though the crosswind was not too strong for an approach, it was too strong for his condition after he got on the ground, and since he was drifting toward the lights, his only option at that point, as far as I am concerned, is to go around.
Moreover, if Bolander was uncomfortable about landing on runway 11-29 without wind direction and velocity he could have landed at Pomona Airport. Cf. In re Air Crash at Dallas Fort Worth Airport, supra, 919 F.2d at 1087 ("The better choice is represented by the standard pilot's maxim, quoted in United States Exhibit 741: `If in doubt, get out.'").
The judgments are affirmed.

APPENDIX

BADER FIELD OPERATIONAL RECOMMENDATIONS
With strong reference to the FAA's 1983 "Atlantic City Airports Role Study", Pan Am has developed the following recommendations for the operation of Bader Field.
Rather than re-write many sound policy proposals made in the 1983 FAA Study, Pan Am has chosen to assemble and update the statistics on Airport operations at Bader Field. In doing so, a clearer definition of the present number, type and nature of each operation can be assessed; the assumption being that Bader Field's role must be modified in relation to its existing operational status.
*85 The basis for all of the policy conclusions to be listed is the continued and environmentally compatible safe operation of Bader Field, within the constraints of available runway length and increased urban development and obstacles leading to restricted maneuvering airspace. To do so, enhanced restrictions must be placed on certain aircraft presently using Bader, and an alteration of the runway use priority and decision-making process must also be accomplished.
Our recommendations will center on two basic operational modifications:
1. Limiting aircraft utilizing Bader Field to:
a) Special performance aircraft (STOL)
 DHC-7 (Dash 7)
 DHC-6 (Twin Otter)
 Casa 212
b) Rotorcraft of all types (VTOL)
c) Single engine aircraft (all types)
d) Twin-engine aircraft with published approach speeds of 91 knots or less; and published accelerated-stop distance less than 2950 feet.
2. Establishment of a preferential/priority runway use system.
For the purposes of these recommendations and their implementation it should be noted that the City of Atlantic City may prohibit or limit any given type, kind or class of aeronautical use of the airport as necessary for the safe operation of the airport or to serve the Civil Aviation needs of the public. This is not to say that such limitations or restrictions will go unchallenged.
1. Bader Field Aircraft Limitations

For the first five months of 1986 there were approximately 8,000 commuter operations operated by the DASH-7, Twin Otter, and the CASA 212. There were also some 5,000 general aviation operations. Of these, about 71% were single engine, 16% Category A multi-engine and 13% Category B multi-engine.
Listed below is a breakdown of the Category B aircraft operations:

*86
 Category B Multi-Engine[*]
 (91K and Greater)
A/C Type App Sp. % No. of Ops.
Mitsubishi MU-2 95 2.9 19
Piper Chieftain PA 31 96 16.3 106
Beech Baron B-55 95 9.8 64
Beech King Air 100 B-90 108 10.1 66
Piper Aerostar PA-60 92 6.4 42
Piper Cheyenne PA-31 98 14.0 91
Cessna Chancellor 414 94 11.0 72
North American Commander 98 3.5 23
Cessna Golden Eagle 421 96 7.8 51
Cessna Titon 404 105 12.1 79
Cessna 441 100 5.6 37
 ___
 650 TOTAL

The recommendation for exclusion of these aircraft in "Category B" is based on the finding that they cannot meet the criteria that:
a) Aircraft must be able to operate safely under all conditions within the design parameters of the runway lengths available.
b) Aircraft must have adequate airborne performance, including performance after loss of one engine, to ensure safe obstacle clearance.
To meet the above restrictions, it is recommended that the City authorize Pan Am, its operating agent to specify the type and category of multi-engine aircraft to begin phasing out operations at Bader Field on a gradual basis.
In addition, a preliminary plan has been formulated and coordinated with the FAA to accommodate at the Pomona facility all activity affected by these recommendations. However, this should be looked upon only as a short-term accommodation to take advantage of Pomona's present adequate reserve capacity. Advance plans must be formulated to allow for Pomona to permanently accommodate the normal growth which would have occurred and been handled at Bader if no restrictions had been imposed.

*87
 Bader Field based aircraft to be
 accommodated at Pomona
 2 PA-31 Piper Chieftain/Navajo
 1 C-402 Cessna Businessliner
 1 MU-2 Mitsubishi
 1 B-80 Queen Air
 1 PA-60 Piper Aerostar

2. Preferential Runway Use System

In order for Bader Field to operate as efficiently as possible while maintaining environmentally acceptable aircraft safety and noise standards, the following runway use program has been developed. presupposes that under normal operating conditions (VFR conditions, acceptable crosswind component, good runway surface conditions, no reports of wind shear) all pilots will comply with these established procedures. When any of these conditions do not exist, the Tower will assign the runway most nearly aligned with the prevailing wind.
When used properly, aircraft overflight of known areas of noise sensitivity will be infrequent, if at all. Known areas of concern are: Chelsea Heights, Ventnor Heights, Venice Park and Westside. Pilot compliance will be enhanced by the Air Traffic Control Facility when in operation to ensure that proper procedures are executed without compromising pilot discretion.

Runway Use Procedures
Listed in the order of priority for departures and arrivals:

 When: Departing on Arrivals on
 1. Runway 29 1. Runway 11
 2. Runway 4 2. Runway 22
 3. Runway 11 3. Runway 29

A permanent prohibition (except in emergencies) on the use of Runway 4 "Bridge runway" for arrivals and on Runway 22 (Departures over Chelsea) is recommended. The associated community concern over the use of these runway directions combined with the restriction on aircraft types utilizing the airport (slower and more maneuverable) make it possible to phase out its use. Thus, it is recommended that the City authorize Pan Am to prepare, in consultation with the Bader Tower manager, a Letter to Airmen outlining the specific procedures for runway arrival and departure procedures and disseminate it to all transients, based customers, and pilots in adjoining states. In addition we anticipate holding "user meetings" *88 with the aviation community to publicize the new noise abatement procedures that will be in effect.

Conclusions of Analysis
Without question, Bader Field's role in Atlantic City's growth as a transportation facility has value. However, despite unprecedented urban development coupled with increased air traffic, measures can be taken to ensure that its operation is continued in as safe and environmentally compatible fashion as possible.
We feel that if the foregoing recommendations are accepted and adopted, Bader Field can continue to be an asset to Atlantic City.
NOTES
[1] According to the report prepared by plaintiffs' expert, the exact time of the accident is in dispute.
[2] Visual Flight Rules (VFR)  Rules that govern the procedures for conducting flying under visual conditions.
[3] The runway numbers are magnetic compass headings. Runway 4-22 is on a northeast to southwest axis. A plane landing on runway 4 will be on a course of approximately 40° . A plane landing on runway 22 will be on a heading of 220° , though it is the same strip of pavement as runway 4.
[4] Plaintiffs' joint brief inaccurately summarizes Eavers' deposition testimony. It states that "Mr. Eavers specifically remembers Mr. Bolander calling for and receiving weather information and instructions from the tower." Eavers did not state that the pilot called for and received weather information.
[5] We reproduce two footnotes from the opinion in Stratmore v. United States, 206 F. Supp. 665, 674-75 n. 6 and 7 (D.N.J. 1962), explaining aerodynamic stall:

6. The lift of an airplane wing (airfoil) is obtained either by the curvature (camber) of the wing section or by setting the wing at an angle to the direction of its motion through the air, or both. The direction of the air relative to the plane is called the direction of relative wind. The angle between the chord of an airfoil section and the direction of relative wind is called the angle of attack of the airfoil. The total lift of an airfoil is the sum of the induced lift resulting from the camber of its cross-section and the dynamic lift created by the impact of the air on the under surface of the airfoil when presented to the wind at a positive angle of attack. If the angle of attack becomes negative (below 0° ) there is no lift in the wing. If a plane decreases its speed, the wings must have a higher angle of attack in order to get the same lift. If the plane continues to decrease its speed and increase the angle of attack of the wings, the angle is reached at which burbling begins, which sets up self-generating loss of lift, which terminates in a stall. It is important to realize that a plane will stall when gliding just as readily as when flying, if not more easily, unless the necessary speed is kept up. You must be very careful, therefore, to keep the nose of the plane pointed down. If you get to flying level, the plane may lose gliding speed and stall before you realize what has happened. If a pilot tries to make a sharp turn at too high an angle of attack, the loss of lift due to burbling is such as to render the lift insufficient for its requirements and the centrifugal force causes the plane to stall, even at high speed. Pope & Otis: Elements of Aeronautics.
7. Id. In discussing a spinning stall, at p. 132 of the cited work, the authors say: "It is thought that when a plane stalls, one wing sometimes stalls slightly sooner than the other, then that wing drops, tipping the plane to one side. Let us say it is the left wing which stalls first and drops. As the left wing drops, its angle of attack is increased and it stalls still more, whereas the right wing, being lifted slightly by the lowering of the left wing, has a decreased angle of attack and therefore tends less to stall. A spin is a case of stalling in which one wing, say the left, is given a strong tendency to stall first, in that case the right wing, because of sufficient decrease in angle of attack, does not stall and so retains its lift. The left wing, losing its lift, loses its forward component of gravity, but the right wing retains its forward component of gravity and this force rotates the plane counterclockwise."
[6] The parties have not supplied us with a copy of the contract.
[7] Contrary to the contention in plaintiffs' joint brief, Pan Am did not seek "to immediately reopen runway 4-22 for safety reasons."
[8] We perceive no basis for liability or criticism of the city for closing the runway on May 17, 1986, the day of the prior crash. According to Stephen Williams, the May 17 accident "damaged some of the facilities associated with runway 22." Due to that damage and debris, runway 4-22 was rendered nonoperational. Our focus, therefore, is on the decision to reopen.
[9] We note that this contention is inconsistent with the tone of Pan Am's evaluation report which defers to the city as the ultimate authority. (See Appendix).
[*] Based aircraft included